BOARD OF TRUSTEES OF THE FIRE AND POLICE
EMPLOYEES' RETIREMENT SYSTEM OF THE CITY
OF BALTIMORE *v.* ROLLINS

[No. 28, September Term, 1973.]

*Decided October 10, 1973.*

The cause was argued before BARNES, McWILLIAMS,
SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Neil J. Lewis, Assistant City Solicitor,* with whom were
*George L. Russell, Jr., City Solicitor,* and *Simon Schonfield,
Assistant City Solicitor,* on the brief, for appellant.

*Edward C. Mackie,* with whom were *Rollins, Smalkin,
Weston & Andrew* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

This is the first of a trilogy of cases through which runs a common thread. The substantive question, entitlement to special disability benefits, posed by each is virtually the same, as is the procedural infirmity which each reveals: the failure of the administrative agency to make findings of fact on which its determination could be posited. Fortunately, the lower court to which each appeal was taken in the first instance was able to find that undisputed facts mandated a reversal in this case and in *Board of Trustees of the Employees' Retirement System of the City of Baltimore v. Angelo Grandinetti,* 269 Md. 733, 309 A. 2d 764 (1973), and an affirmance in *Lawrence C. Baker, Sr. v. Board of Trustees of the Employees' Retirement System of the City of Baltimore,* 269 Md. 740, 309 A. 2d 768 (1973). We find ourselves in agreement with the result reached below in each case.

James G. Rollins, Jr., joined the Baltimore City Police Department (the Department) in 1947, and in November, 1971 filed an application for retirement with special disability benefits with the Board of Trustees of the Fire and Police Employees' Retirement System of the City of Baltimore (the Board), as provided by Baltimore City Code (1966) Art. 22, § 34(e):

> "(e) *Special disability benefit.* Upon the application of a member or the head of his department, any member who has been totally and permanently incapacitated for duty as the result of an injury arising out of and in the course of the actual performance of duty, without wilful negligence on his part, shall be retired by the Board of Trustees, provided that the medical board shall certify that such member is physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such member should be retired." [1]

---

1. Code § 34 (f) provides that a special disability benefit shall be an annuity based on contributions plus $66\frac{2}{3}\%$ of average final compensation.

When Rollins was retired with ordinary disability benefits under Art. 22, § 34 (c), but was denied special disability benefits, he instituted a mandamus action in the Baltimore City Court, challenging the decision of the Board. From an order granting Rollins' petition for the writ and entering judgment in his favor, the Board has appealed.

In 1954, while Rollins was operating a Department car in the performance of his duties, he was struck in the rear by another automobile, and sustained injuries to his neck and back for which he was treated by his family physician for about seven months,[2] after which he returned to limited duty, first as a telephone operator for a brief period and later in the Identification Section of the Department's Central Records Division, where he served for 18 years. In 1958, Rollins was promoted to Sergeant.

When Rollins applied for an award of special disability benefits, he did so on the theory that he had become permanently and totally disabled as a result of the injury sustained in the 1954 automobile accident.

The medical board of the Retirement System, Doctors Daniel J. Pesagno, William H. Kammer and Frederick J. Vollmer, examined Rollins and concluded that Rollins was suffering from

"1 — Chronic cervical & lumbar back strains.

2 — Osteoarthritis of cervical and lumbar spine.

3 — Traumatic neurosis secondary to (1)."

The medical board further concluded that Rollins was physically incapacitated, that the incapacity was likely to be permanent, that he was incapacitated for duty, and ought to be retired. After a hearing the Board denied Rollins' application for special disability benefits.

The situation here is strangely reminiscent of that in *Adams v. Board of Trustees*, 215 Md. 188, 137 A. 2d 151 (1957), where Adams, an ambulance attendant, sustained a back injury when a patient being carried on a litter suddenly

2. Rollins settled his case against the driver of the other car for $8,000.00.

shifted his weight. Adams was assigned to less strenuous duty, and later sought what was then known as "accidental" disability benefits. The medical board found that Adams was incapacitated, that the incapacity was likely to be permanent, and that Adams ought to be retired.

Our predecessors identified the issues in *Adams*, 215 Md. at 194-95, 137 A. 2d at 154-55:

> "The Medical Board, having certified that the petitioner was mentally or physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that he should be retired, the ordinance makes it clear that the Board [of Trustees] had to decide (i) whether the incapacity to perform his duty was the natural and proximate result of an accident which occurred while the petitioner was in the actual performance of his duty at some definite time and place,[3] and (ii) if there was an accident, whether it was caused without wilful negligence on the part of the petitioner. * * * [T]here is ample testimony by the petitioner, corroborated by the engine company lieutenant and the fire department physician who first examined him, as to how, when and where he was injured. * * * Thus the only *real* decision the Board had to make was whether the petitioner became incapacitated as the natural and proximate result of the only accident of which there was any proof." (Emphasis in original.)

It seems clear to us that the only issue before the Board in this case was whether Rollins' incapacity was the natural and proximate result of what Art. 22, § 34 (e) describes as "an injury arising out of and in the course of the actual performance of duty, without wilful negligence on his part." There is not the slightest intimation that the accident was a result of Rollins' negligence, because the rear end collision occurred when he had stopped at a traffic light.

---

**3.** At that time the ordinance contained such a provision.

*Adams* then goes on to describe the limits of judicial review of the Board's decision:

"Of course, if the action the Board took had been supported by the evidence, or if there had been any disputed facts before it, its decision would not be open to judicial reversal. *Heaps v. Cobb,* [185 Md. 372, 45 A. 2d 73 (1945)] at p. 385. But there was no *real* dispute as to any of the essential facts. In fact the evidence unmistakably supports the claim of the petitioner for an accidental disability retirement as prescribed by the ordinance. Thus, there was no basis for the exercise of judgment or discretion. *Heaps v. Cobb, supra,* at p. 386. Yet, the Board decided, by a majority vote, without assigning any reason therefor, to disapprove accidental disability retirement. In so doing we think it is clear that the Board was arbitrary in arriving at the conclusion it did because its action was not supported by the evidence. *Heaps v. Cobb, supra,* at p. 380. Instead, the Board had the mandatory duty of approving the application of the petitioner for accidental disability retirement." 215 Md. at 195-96, 137 A. 2d at 155. (Emphasis in original.)

This leads us unerringly to an application of the *Adams* criteria to the testimony in this case. Rollins' personal physician, Dr. Harold R. Bohlman, examined him two days after the accident. Dr. Bohlman's diagnosis was:

"1. Acute sprain, cervical spine.
   a. Probably disruption C-5 disc.
   b. Possibly some of C-6."

Dr. Bohlman examined Rollins again in September, 1955, approximately 17 months after the accident. The following is an excerpt from his report:

"Diagnosis:
1. Disruption of C-5 disc, partial subluxation of C-4 on C-5.

2. Persistent signs of neck sprain this area downward to upper dorsal.

Prognosis:

Guarded.

Disability:

Partial permanent disability — one would judge 25% of the neck."

In January, 1968, Rollins was seen by Dr. Leonard Gilmor, a chiropractor. He complained of giddiness, vertigo, and spells of "passing out" which had become progressively worse, beginning in May, 1966. Dr. Gilmor noted:

*"X-RAY:* Cervical spine, negative for fracture pathology. There are degenerative changes noted, with lipping formation at the inferior border of C6. There is some forward subluxation of: C3-C4-C5. There is some decreased disc space (posterior portion) of C4-C5, C5-C6.

*IMPRESSION:* Cervical spine, spondylosis; an apparent aggravation of his original injury. Giddiness and vertigo, secondary to the spondylosis of the cervical spine."

Dr. Lester N. Kolman, who had been Rollins' personal physician since 1951, filed with the Board a report dated 24 November 1971 in which he said:

"Diagnosis: Hypertension

Severe pain in back & neck following injury of 1954 has become progressively worse — Headaches & dizziness worse — he is now incapacitated. Probable circulatory insufficiency symptomatically.

In April, 1972, Dr. Kolman amplified this report:

"On questioning him closely today, he still

complains of severe pain of his neck and into his shoulders. He has an occasional dizzy spell and he tries to soft pedal this, but it is present. He passes this off as being only a spell of wooziness rather than real dizziness. He hasn't passed out from this, however he does feel a little unsteady on his feet at times, especially when tired, upset. The pain of the neck is almost always present; it is worse in the morning when he first gets up. It is also aggravated when he is tired and toward the end of the day.

In reviewing some of his past medical reports from Dr. [Bohlman] and Dr. [Mosberg], it is my opinion that Sgt. Rollins has a degenerative disc in his neck and this, of course, becomes progressively worse. I think, at this time, he has a permanent partial disability of 75% of his neck; motion of the neck in any extreme is painful. Taking into consideration the type of job he has, it is very exacting, it takes extreme care, he has to be careful not to make mistakes and this puts him under added pressure which, of course, aggravates his condition. Just how he keeps working all the time, I honestly can't say but it seems to me he is having more pain than he admits and he probably should not be working in a position of this type. I would say he has a permanent disability and probably should not be working at all. He should be allowed to rest whenever he can, get up leisurely, sleep as long as he can whenever he wants to."

As against this, the evidence on which the Board seems to have relied consisted of reports from Dr. John W. Ashworth, the Police Department's chief physician; from Dr. William H. Mosberg, Jr., the Department's neurosurgeon; from Dr. Frank Barranco, the Department's orthopedist, and the testimony of Dr. Frederick J. Vollmer, the Board's medical consultant. From the pertinent excerpts which follow, it is palpably clear that the reports dealt primarily with the extent of Rollins' physical disability (an issue which the report and recommendation of the medical board had

conclusively determined) and that only Dr. Vollmer's testimony dealt with causation, which was the only issue remaining before the Board.

Dr. Ashworth, report of 23 March 1972:

"On April 13, 1954 he was involved in a Departmental accident, sustaining injuries to his cervical spine with a probable slipped disc (C-5). He was treated at Mercy Hospital and also by orthopedic surgeon, Dr. Harold H. Bohlman. Up to the present time he has had no further medical leave due to this injury.

"In the meantime Sgt. Rollins developed an apparent Meniere's disease with dizziness and syncope and was placed on limited duty in 1966 in the Identification (Fingerprint) Section. In 1967 he was placed on permanent limited duty due to circulatory deficiency of his carotid arteries, according to his personal physician, Dr. L. Kolman, who filled in his Form 25.

"Most recent x-rays of the cervical spine demonstrate arthritic spurring of all the cervical vertebrae; however, there is no disc space narrowing which would indicate a disc injury.

"Sgt. Rollins has been examined by Dr. Mosberg, our neurosurgeon, who finds no neurological deficit and cannot correlate his complaint of dizziness and syncope to his injury of 1954. Sgt. Rollins informed Dr. Mosberg that he had really not had an attack of dizziness since 1968.

"On March 22, 1972 Sgt. Rollins was examined by Dr. Barranco, our orthopedic surgeon, who states that although he has some signs of neck and back disease he is not disabled in his present job due to this condition.

"Due to the conflicting reports from the various doctors who have examined this man I am unable to state if he should be retired and the decision should be left to the City Medical Board."

Dr. Mosberg, report of 9 March 1972:

"I found no evidence of cervical or lumbar nerve root compression, herniated intervertebral disc in these areas or any. intraspinal or neurosurgical cause for his symptoms. It would appear that his complaints of neck pain and low back pain would need be evaluated orthopedically rather than neurosurgically. I was asked the specific question as to whether I could correlate anything between his injury in 1954 and his attacks of syncope. One does at times see some dizziness in relationship with neck injuries. I do not recall ever having seen on the basis of a neck injury an episode such as the patient described in which he would fall to the floor and the room would be spinning around. Incidentally, the patient tended to minimize his attacks of 'dizziness' and stated that he had not really had any such attacks since 1968 and the only complaint along these lines was that he felt a little woozy at times.

"I know of no further neurosurgical measures that would be likely to be beneficial and I would have no specific neurosurgical recommendations."

Dr. Barranco, report of 22 March 1972: [4]

"[History of ?] old cervical injuries as well as LB.P. [lower back pain?]. Rx by Dr. Harold [Bohlman] & chiropractor, more recently by Dr. Kolman, M.D. with muscle spasm medicine. Bending [yields ?] pain in low back . . . [illegible]. Neck is sore to touch — feels like a weight on neck. Has had dizziness problem. No [arm ?] pain or numbness recently. P.E. Hyper-extension of head [yields ?] pain in cervical thoracic area. Advance tests [negative ?]. Reflexes OK. No numbness in

---

4. It is unclear from the record whether this is Dr. Barranco's written report, or his verbal report as transcribed by Dr. Ashworth. Much of the handwriting, including the signature, is illegible.

[arms ?]. No tenderness [over ?] peripheral nerves in arms. No weakness or atrophy. Bends at waist to 80°s severe pain. SLR [yields ?] 90°s pain. No reflexes or sensory change in lower limbs. Pulses OK.

"X-Ray — C spine — [spurring ?] & disc degeneration although [patient] shows signs of neck & back disease, he does not seem to be totally disabled for his present job."

In his testimony before the Board, Dr. Vollmer said:

"Q. What were the results in your opinion of your examination of December 10, 1971, Dr. Vollmer? What is your diagnosis? A. Actually after examining him and questioning him at some length, the opinion was that the symptoms of which he complained, although they were related to the neck injury, they were considerably more than you would expect from this type of injury he had. The diagnosis was made of chronic cervical and lumbar back strain and, 2, diagnosis was osteoarthritis of the cervical and lumbar spine. 3, traumatic neurosis secondary to number 1. In other words, we felt that the dizziness, syncope, these symptoms were actually far more than should have occurred from the injury itself and from the type of changes that had occurred in the cervical spine.

"So that we felt that the symptoms were to a large extent functional, were due to the patient's anxiety about his injury.

"Q. That's why you added the diagnosis number three? A. That's correct.

"Q. As a result of these three diagnoses, have you reached a decision that he was physically incapacitated? A. For full police duty, yes."

Under cross-examination, Dr. Vollmer then turned to the only issue before the Board:

"Q. You heard Sgt. Rollins testify, describing the

incident of April, 1954. I believe you said that in his history as given to you he described the incident of 1954 and explained that he has never been free of symptoms since that time, is that correct? A. That's correct.

"Q. You heard Sgt. Rollins testify he has had no other trauma other than the accident of April, 1954, is that right? A. That's correct.

"Q. On the basis of this testimony, the history and your findings, would you say that your diagnosis number 1 — chronic cervical and lumbar back strain — can reasonably be attributed to the accident of 1954? A. Yes, I would.

"Q. Could you say that your diagnosis number 2 — osteoarthritis of those same two areas — was aggravated or lighted up by the accident of 1954? A. I think you have to conclude that, because there has been a progressive development of this spondylosis over the years since then. Since there was very little osteoarthritis at the time of the original X-rays, I would have to conclude that this has been initiated by the accident and has progressed since then.

"Q. You also conclude that the traumatic neurosis which you describe, the functional component of his complaints, is secondary to your diagnosis number 1 dealing with the accident of '54, is that correct? A. Yes, I think this patient has developed a very definite anxiety state about his condition, and this is what has produced a lot of the dizzy symptoms and syncopes and so on."

As we see it, *Adams v. Board of Trustees, supra,* 215 Md. 188, 137 A. 2d 151, is clearly dispositive of this case. Here, as in that case, there was no real dispute as to the essential facts, and no unequivocal evidence on the question of causation, save Dr. Vollmer's testimony, which supported Rollins' contention. There was no basis for the exercise of judgment or discretion by the Board, and when the Board

denied Rollins' claim for special disability benefits, its conclusion, unsupported by the evidence, was arbitrary, and should have been vacated below, as it was.

*Order and judgment affirmed,*
*costs to be paid by appellant.*