# BOARD OF TRUSTEES OF THE FIRE AND POLICE EMPLOYEES RETIREMENT SYSTEM OF THE CITY OF BALTIMORE
## v. STEPHEN J. CHES, JR.

[No. 154, September Term, 1981.]

*Decided November 23, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*L. William Gawlik, Assistant City Solicitor,* with whom were *Benjamin L. Brown, City Solicitor,* and *Sheldon H. Press, Chief Solicitor,* on the brief, for appellant.

*Leslie L. Gladstone* for appellee.

DAVIDSON, J., delivered the opinion of the Court.

This case presents a question concerning the circumstances under which a disabled police officer is entitled to receive a special disability retirement benefit pursuant to Baltimore City Code (1976 Ed.), Art. 22, § 34 (e).[1] That section provided:

"(e) *Special disability benefit.* Upon the application of a member or the head of his department, any

---

1. Art. 22, § 34 (e) was amended by Baltimore City Ordinance 1126, 1979, effective 1 July 1979. That amendment is not relevant here.

member who has been totally and permanently incapacitated for duty as the *result of an injury arising out of and in the course of the actual performance of duty,* without willful negligence on his part, shall be retired by the Board of Trustees, provided that the medical board shall certify that such member is physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such member should be retired." (Additional emphasis added.)

More particularly, the question presented is whether evidence of a police officer's alleged malingering tends to show that the police officer's disability is not the result of an injury arising out of and in the course of duty.[2]

On 1 August 1977, the respondent, Baltimore City Police Detective Stephen J. Ches, Jr. (police officer), suffered an injury to his right shoulder when a police department vehicle, which he was operating while on duty, was struck in the rear by a tractor trailer. After complaining of pain in his right shoulder, he was treated at Mercy Hospital and placed on four days medical leave. When he returned to work, he continued to have problems with his shoulder.

On 8 August 1977, the police officer's x-rays showed soft tissue swelling in the shoulder, but no fracture, dislocation or tissue calcification. On 10 August 1977, he was examined by an internist who found that he had "an acute, rather severe right shoulder injury," and prescribed appropriate physical therapy. The police officer then returned to full active duty, but continued to experience discomfort in his right shoulder for which he regularly received physical therapy from the internist.

On 8 February 1978, the police officer was examined by an orthopedic surgeon who found that he was "tender over the acromioclavicular joint, as well as over the greater

---

2. Throughout this opinion, the phrase "an injury arising out of and in the course of duty" means "an injury arising out of and in the course of the actual performance of duty, without willful negligence on [the police officer's] part."

tuberosity of the humerus." That orthopedic surgeon concluded:

> "[The police officer's] present complaints are legitimate and are *confirmed by positive objective physical findings.* In my opinion he has sustained a permanent partial disability of the right shoulder to the extent of 20%." (Emphasis added.)

In October 1978, the internist, who was the police officer's treating physician, placed him on limited work duty because he was experiencing severe pain. In November 1978, he was examined by a second orthopedic surgeon who found that he had "tenderness over the acromioclavicular joint and bicipital groove as well as rotator cuff"; that he had "definite limitation of shoulder motion on rotational movements and elevation and there is an audible and palpable crepitus"; and that his condition "actually is progressively deteriorating." Although the results of a shoulder x-ray were normal, he was treated with Cortisone injections. When the pain persisted, the orthopedic surgeon suggested surgery for the shoulder, stating that he could not "offer any guarantees" of a cure. The police officer declined to undergo the surgery and continued on limited duty.

In January 1979, the police officer filed an application for a special disability retirement benefit. In February, the Medical Board found that the police officer had "[m]ild residual musculo-ligimentous strain of the neck and right shoulder girdle," but that he was not totally disabled and ought not be retired. On 12 March 1979, the petitioner, the Board of Trustees of the Fire and Police Employees Retirement System of the City of Baltimore (Board of Trustees), denied the application.

In April 1979, the police officer was placed on permanent limited duty. His severe shoulder pain persisted. Beginning 10 April 1979, he began missing work regularly, although between the time of the accident and the time that his initial claim had been denied, he had missed work only sporadically and for reasons unrelated to his shoulder injury. Indeed,

after 10 April 1979, he began to miss work one or two days per week because of the shoulder injury.

On 27 June 1979, the police officer filed a second application for a special disability retirement benefit. In August, he was reexamined by the Medical Board that found he suffered from, among other things, the following relevant ailment:

*"Post traumatic arthritis, right acromioclavicular joint, with minimum x-ray deformity and maximal non-physiological loss of function,* unresponsive to various modalities of treatment." (Emphasis added.)

The Medical Board certified to the Board of Trustees that the police officer was totally and permanently physically disabled for the performance of police duties and that he ought to be retired.

A hearing was conducted before the Board of Trustees at which much evidence was presented. In particular, Dr. Frederick J. Vollmer, a physician appearing on behalf of the Medical Board, testified that he had examined the police officer on 20 February 1979. He stated that at that time, the only objective physical evidence of disability was "slight acromioclavicular tenderness." There was no muscle atrophy or loss of tone, and the shoulder had a good range of motion. On the basis of that examination, it was determined that he had "some residual musculo-ligamentous injury to the shoulder," but that he was not disabled. He was advised to return to work.

Dr. Vollmer testified that he again examined the police officer on 3 August 1979 because his pain had become more persistent. At that time, he was still tender in the acromioclavicular joint. However, there were no changes in his physical condition and, more particularly, no deterioration of any of the structures of the right shoulder. Nonetheless, in view of the fact that his symptoms were more debilitating and that an orthopedic surgeon had suggested surgery, the Medical Board decided that he suffered from "post traumatic arthritis, right acromioclavicular joint,

with minimum x-ray deformity and maximal non-physiological loss of function, unresponsive to various modalities of treatment." However, because the degree of incapacity was disproportionate to the physical findings, he was referred to a psychiatrist who found that he did "not show any definite psychopathology at this time."

Thereafter, in the course of Dr. Vollmer's testimony, the following colloquy took place:

"Q [Baltimore Assistant City Solicitor] . . .

"Prior to this examination, my records indicate four days lost starting on 8/2/77; next loss was for a toothache; next lost was for a virus; next loss was for high blood pressure; next loss was virus; 10/18/78 arm injury; and then we have nothing until 4/10/79.

"Now, Page 56 of the brief indicates that on March 12, 1979, Mr. Ches was mailed a letter saying he was not eligible for retirement.

"Now, starting two weeks after that, Mr. Ches begins missing two days very regularly once a week. On 4/10/79, one day; 4/17/79, recurring shoulder injury, two days; 4/23, which is one day less than a week later, two days lost for recurring shoulder injury; one week and one day; 5/1/79, two days missed, sore shoulder; six days later, 5/7/79.

"Isn't it correct, doctor, that the only thing that really changed between your evaluation of February, 1977 and August was Mr. Ches' complaints about his shoulder?

"A [Dr. Vollmer] I tried to make that plain, that this was a consideration for his disability in the August 7th assessment.

"Q Do you see anything unusual about this pattern of a 1977 injury? Three days taken off on 1978 and then this period of time being missed after receiving your rejection for retirement?

"A Well, as I say, this is why we concluded that he had, basically, maximum non-physiological loss of function. He was unable, as he's testified here

today, to do things and, yet, there has been no loss of muscle tone or muscle mass, indicating that he was disabled.

"Q  In plain English, you would agree with [a police department physician's] evaluation on 5B, 'I am unable to substantiate any objective findings to corroborate his pain symptoms.'

"A  That's right.

. . .

"In other words, he says exactly the same thing that [an orthopedic surgeon] says, who examined him over a year before that; and he didn't find anything either; yet he says he's got a 20 percent disability based on the fact that he said he couldn't use it.

"Q  But the reason why he couldn't use it is because he says he can't use it?

"A  That's exactly why we sent him to [the psychiatrist], because the question was whether or not this represented injury; or did it represent a type of neurosis; and [the psychiatrist] did not feel that it represented — that the man did have a neurosis as such.

"Q  So that leaves you with one conclusion.

"A  *You can call that, if you want to, malingering. . . .*" (Emphasis added.)

After the hearing, the Board of Trustees concluded that the police officer should be retired as permanently disabled for duty, but that the disability was not the result of an injury arising out of and in the course of duty. In reaching this conclusion, the Board of Trustees said:

"*[W]e find the claimant not disabled as a result of the subjective symptoms of his right shoulder,* nor as a result of his obesity or hypertention. *We accept Dr. Vollmer's testimony and the Board's conclusion of 'maximal non-physiologic loss of function.'* We are also mindful of the precise periodicity with which the claimant lost time from work *after* the

rejection of his first application and *prior* to his reexamination by the Medical Board. We find that there was no substantial change in the claimant's physical ability to do his job between the time the Medical Board rejected his initial application, and accepted the second. We conclude that the Medical Board adopted the view, in accordance with their policy, that personnel who consistently miss time from work cannot perform their duties and are thereby incapacitated irrespective of the reason (if any) why the employee missed time. The merits of that policy may not be debated here, as the charge found in the ordinance is clear. The claimant has been certified by the Medical Board to be retired and as we cannot compel him to perform his duties, *we must conclude that he be retired as permanently incapacitated* for duty, for reasons stated above, *not as a result of injuries arising out of and in the course of the actual performance of duty* and without wilfull negligence on his part." (Additional emphasis added.)

Consequently, the Board of Trustees denied the police officer's application for a special disability retirement benefit and awarded him only an ordinary disability retirement benefit.[3]

On 22 May 1980, the police officer filed a petition for a writ of mandamus in the Superior Court of Baltimore City. In a written opinion, that court said:

---

**3.** Baltimore City Code (1976 Ed.), Art. 22, § 34 (c) provided:

"(c) *Ordinary disability retirement benefit.* Upon the application of a member in service or of head of his department, any member who has acquired five or more years of service may be retired by the Board of Trustees, not less than thirty and not more than ninety days next following the date of filing such application, on an ordinary disability retirement allowance, provided that the medical board, after a medical examination of such member, shall certify that such member is mentally or physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such member should be retired."

Art. 22, § 34 (c) was amended by Baltimore City Ordinance 1126, 1979, effective 1 July 1979. That amendment is not relevant here.

"Here, there was no doubtful evidence on the question of medical causation, nor was there any evidence contradicting Petitioner's assertion that he incurred an accident arising out of and in the actual performance of duty. The Respondents' conclusion in denying the Petition for special disability benefits was unsupported by the evidence and was therefore arbitrary."

The trial court reversed the decision of the Board of Trustees by issuing a writ of mandamus requiring the Board of Trustees to approve the police officer's claim for a special disability retirement benefit.

The Board of Trustees appealed to the Court of Special Appeals. In a reported opinion, *Board of Trustees of the Fire and Police Employees Retirement System of the City of Baltimore v. Ches,* 50 Md.App. 200, 436 A.2d 1131 (1981) (Gilbert, C.J., dissenting), that Court affirmed for reasons other than those expressed by the trial court. That Court said:

"In this case there was evidence which, if believed, could have been interpreted as indicating that appellee's disability was *not* causally connected to the accident of 1977.

. . .

"Notwithstanding the evidence from which the Board could have found appellee's disability the fruit of something other than the 1977 accident, the Board made conclusions contrary to the evidence adduced at the hearing.

"The Board in concluding 'that the Medical Board adopted the view . . . that personnel who consistently miss time from work cannot perform their duties and are thereby incapacitated irrespective of the reason (if any) . . .', reached a conclusion not supported by any evidence. In effect, the Board's conclusion is a statement that appellee was *not*

disabled, but that appellee was being retired due to time missed from work.

"We point out that the determination of whether appellee was disabled is a function within the province of the medical board, not the Board of Trustees. Here, the Board invaded the bailiwick of the medical board, which proved to be its Achilles' heel. As stated above, the function of the Board is to determine whether appellee's disability was causally connected to the 1977 accident.

"The trial court in reversing the Board arrived at the correct conclusion, but for the wrong reason; therefore, we shall affirm the decision of the lower court." *Ches,* 50 Md.App. at 206-07, 436 A.2d at 1134 (emphasis in original) (footnote omitted).

The Board of Trustees filed a petition for a writ of certiorari that we granted. We shall affirm the judgment of the Court of Special Appeals for the reasons expressed by the trial court.

This Court has repeatedly stated that in cases arising under then Baltimore City Code, Art. 22, § 34 (e), it is the function of the Medical Board to determine that an applicant is physically disabled, that his disability is likely to be permanent, and that he ought to be retired. After those decisions have been made by the Medical Board, the only issue to be determined by the Board of Trustees is whether the applicant's disability was the natural and proximate result of "an injury arising out of and in the course of the actual performance of duty, without willful negligence on his part." *Board of Trustees v. Rollins,* 269 Md. 722, 725, 309 A.2d 758, 760 (1973); *Board of Trustees v. Grandinetti,* 269 Md. 733, 735, 309 A.2d 764, 765 (1973); *Adams v. Board of Trustees,* 215 Md. 188, 194-95, 137 A.2d 151, 154-55 (1957). Thus, in *Rollins,* this Court reiterated:

" 'The Medical Board, having certified that the petitioner was mentally or physically incapacitated for the further performance of duty, that such inca-

pacity is likely to be permanent, and that he should be retired, the ordinance makes it clear that the Board [of Trustees] had to decide (i) whether the incapacity to perform his duty was the natural and proximate result of an accident which occurred while the petitioner was in the actual performance of his duty at some definite time and place, and (ii) if there was an accident, whether it was caused without wilful negligence on the part of the petitioner. * * * [T]here is ample testimony by the petitioner, corroborated by the engine company lieutenant and the fire department physician who first examined him, as to how, when and where he was injured. * * * Thus the only *real* decision the Board had to make was whether the petitioner became incapacitated as the natural and proximate result of the only accident of which there was any proof.' (Emphasis in original.)" *Rollins,* 269 Md. at 725, 309 A.2d at 760 (footnote omitted).

Here there was evidence before the Board of Trustees to show that on 1 August 1977 the police officer suffered an injury to his right shoulder when a police department vehicle, which he was operating while on duty, was struck in the rear by a tractor trailer. In August 1977, an internist found that there was physical evidence of a severe shoulder injury and prescribed appropriate physical therapy. In February 1978, an orthopedic surgeon found positive, objective physical evidence of injury, and a permanent partial disability in the shoulder to the extent of 20 percent. In November 1978, another orthopedic surgeon found that there was physical evidence of injury and that the police officer's condition was progressively deteriorating. That orthopedic surgeon treated him with Cortisone injections and suggested surgery for the shoulder. In February 1979, the Medical Board found physical evidence of an injury, but additionally found that the police officer was not totally disabled for the performance of duty. In August 1979, the Medical Board again found physical evidence of injury and additionally found that the police officer was totally and permanently physically

disabled for the performance of police duty, and ought to be retired. All of this evidence tended to show that the police officer was totally and permanently disabled for duty as a result of the 1 August 1977 injury that arose out of and in the course of duty.

In addition, there was some medical testimony before the Board of Trustees to show that when the police officer was examined in February 1979, the only objective physical evidence of the police officer's disability was slight acromioclavicular joint tenderness; that when he was again examined in August 1979, there was no change or deterioration of his physical condition; that the degree of his disability was disproportionate to the physical findings; that his disability did not result from psychopathology; and that, indeed, his disability resulted from malingering.

Malingering is the act of pretending to be ill or injured in order to avoid work. *The American Heritage Dictionary of the English Language* 790 (1970). Thus, this medical testimony, if believed, tended to show at most that the police officer was not disabled, but rather was pretending to be ill or injured in order to avoid work. Accordingly, this medical testimony was relevant to the question of disability appropriately considered by the Medical Board that conclusively determined that the police officer was, in fact, disabled. This medical testimony did not tend to show the cause of the police officer's conclusively established disability. Therefore, it was not relevant to the only issue appropriately before the Board of Trustees — whether the police officer's disability was the natural and proximate result of an injury arising out of and in the course of duty.

Under these circumstances, there was no probative evidence to show that the police officer's disability was not caused by an injury arising out of and in the course of duty. The Board of Trustees' conclusion that the police officer was not disabled as a result of injuries arising out of and in the course of duty was unsupported by the record and was, therefore, arbitrary. *Rollins,* 269 Md. at 732-33, 309 A.2d at 764; *Grandinetti,* 269 Md. at 740, 309 A.2d at 768; *Insurance*

*Comm'r v. National Bureau of Casualty Underwriters,* 248 Md. 292, 300-01, 236 A.2d 282, 286-87 (1967). Accordingly, we shall affirm the judgment of the Court of Special Appeals for reasons other than those expressed by that Court.[4]

> *Judgment of the Court of Special Appeals affirmed.*
> *Costs to be paid by petitioner.*

---

**4.** In view of our decision, we need not consider the petitioner's remaining contentions.