981 A.2d 747

**Stephen P. HERSL**

v.

**FIRE & POLICE EMPLOYEES' RETIREMENT SYSTEM.**

No. 0814, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Oct. 5, 2009.

Paul D. Bekman (Emily C. Malarkey, Salsbury, Clements, Bekman, Marder & Adkins, LLC, on brief), Baltimore, for Appellant.

Herbert Burgunder, Jr., William R. Phelan, Jr. (George A. Nilson, City Solicitor, on brief), Baltimore, for Appellee.

Panel: DAVIS, MEREDITH, RODOWSKY and LAWRENCE F. (Retired, Specially Assigned), JJ.

RODOWSKY, J.

Stephen Hersl (Hersl or the Claimant), appellant, was injured in the line of duty as a Baltimore City firefighter on February 5, 2006, and never returned to work. Following notification that he would be retired, effective February 6, 2007, he applied for line-of-duty (LOD) disability retirement. A hearing examiner denied the application, concluding that the LOD injuries were not permanent and that the cause of his permanent total disability was a non-LOD heart condition. Hersl was unsuccessful on judicial review by the Circuit Court for Baltimore City. His appeal to this Court presents the following questions:

"I. Is there substantial evidence supporting the hearing examiner's determination that Mr. Hersl's disability is caused by heart disease rather than line-of-duty injuries?

"II. Is there substantial evidence supporting the hearing examiner's determination that Mr. Hersl's shoulder injuries are not permanent?

"III. Is there substantial evidence supporting the hearing examiner's determination that Mr. Hersl's leg injuries are not permanent line-of-duty injuries?

"IV. Did the circuit court err as a matter of law when it determined that Mr. Hersl is not entitled to retirement benefits if he is disabled as a result of a combination of injuries?"

## I. The Accident and Injury

Hersl joined the Baltimore City Fire Department as a firefighter on January 26, 1987, when he was twenty-four years old. He was in perfect health, as confirmed by a physical examination.

On or about May 13, 1998, Hersl injured his left knee in an automobile accident while off-duty. On October 18, 2000, he was injured in another off-duty auto accident, during which his left knee struck the dashboard. That knee continued to bother him, and, in December 2000, he underwent surgery to repair a torn medial meniscus and a torn anterior cruciate ligament.

In February 2006, Hersl's assignment was to Truck Company 30 located on Belair Road at Mary Avenue. At this time, he was an active firefighter, fully and completely able to perform his duties.

On the evening of February 5, 2006, Hersl's unit responded to a call for medical assistance. He and another firefighter were required to remove an incapacitated male, weighing approximately 275–300 pounds, from a basement apartment. The man was placed on a stretcher, and the two firemen

began to ascend a seven or eight step staircase. Near the top of the staircase, Hersl, at the front of the stretcher, and moving backwards, slipped and slid down the stairs with the man and stretcher landing on top of him. Hersl sustained multiple injuries, including jamming his shoulders when attempting to break his fall. He was taken to Mercy Hospital for evaluation and treatment in the early hours of February 6, 2006.

The claimant was experiencing severe pain in his ankle area, left knee, shoulders, and nose. An MRI, performed on February 10, revealed a ruptured right Achilles tendon. This injury was repaired through surgery by Dr. Clifford L. Jeng on February 16, 2006, at Mercy Hospital. There was no resulting disability to the ankle area, and this injury is not involved in the present claim.

Under an apparent arrangement between the Baltimore City Fire Department and Mercy Hospital, Mercy physicians examine firefighters who are on sick call. Mercy periodically reports in longhand to the Baltimore City Fire Department on the status of these firefighters, utilizing a form headed, "PSI VISITATION/DISPOSITION" (a PSI Report). Underlying the PSI Reports are typewritten chart notes. When Hersl was seen under this program, on February 10, Dr. Paula Lyons noted that, in addition to the tendon rupture, the Claimant "also has some shoulder complaints with good range of motion." On March 15, Dr. Lyons noted that Hersl was to remain off-duty, following the tendon rupture repair. As of April 6, the Claimant was recuperating from the Achilles tendon surgery and had not received any treatment for his shoulders.

The Claimant was examined, on April 11, 2006, by Dr. Martin Kanner, a specialist in rehabilitation. Dr. Kanner submitted his report to "Expert Medical Opinions," and, six days later, it was faxed to "Comp Management Inc." Dr. Kanner summarized Hersl's medical conditions as:

"1. Rupture of the right Achilles' tendon—surgically repaired February 16, 2006.

"2. Contusion of the bilateral knees with pre-existing degenerative changes in left knee.

"3. Impingement syndrome—left shoulder

"4. Strained right rotator cuff

"5. Rule out nasal fracture versus contusion.

"All injuries described above, within a reasonable degree of medical certainty[,] are causally related to his accident on February 6, 2006."

Dr. Lyons saw Hersl at Mercy on April 19 and noted his complaints of pain in both shoulders, with the left worse than the right. She approved an MRI of his left shoulder, "since that's the symptomatic shoulder."

The MRI, without contrast, taken on April 20, was read to reflect "no rotator cuff tear," but to reflect "marked subscapularis tendinopathy." Dr. Lyons saw the Claimant on April 25 and, because of his complaints relating to his right and left shoulders, Dr. Lyons referred him to the Orthopedics Department at Mercy where he was seen by Dr. Thomas Whitten. Dr. Whitten ordered an MRI, without contrast, of the right shoulder. Based on both MRIs and his examinations of Hersl, Dr. Whitten concluded, on May 17, that the Claimant's

"left shoulder does have significant rotator cuff pathology, and I think we should go ahead and proceed with an arthroscopy, possible acromioplasty, and repair of rotator cuff. In addition, he may need an AC [acromioclavicular] joint resection."

Dr. Whitten shared this opinion with Dr. Lyons.

Surgery on Hersl's left shoulder was initially scheduled for May 2006. Prior to surgery, however, Hersl suffered a massive heart attack that resulted in quintuple bypass surgery on May 22, 2006. He was back in the hospital again on July 10, 2006, complaining of continued chest pains. At that time, an angioplasty, with coronary artery stenting, was performed.

By October 2006, Hersl was sufficiently recovered to permit medically addressing his shoulder problems. Because Dr. Whitten was not available, the Claimant was referred to Dr.

Joseph J. Ciotola. On October 11, after Dr. Ciotola examined Hersl and explained the options to him, the plan was to operate on the right shoulder first, and, if there were no cuff tear, proceed to repair of the left shoulder. Otherwise, there would be separate surgeries, six to twelve weeks apart. Dr. Lyons was so advised.

On October 31, 2006, the Claimant was seen at Mercy by Dr. James D. Levy for a PSI Report. In his report, Dr. Levy stated that the reason for the visit was "Follow-up Achilles tendon, shoulders, left knee, heart." Under "Remarks," Dr. Levy stated, "This gentleman has multiple medical problems, some of them serious, and he will not be returning to full duty for the Baltimore City Fire Department." Under "Diagnosis," the PSI Report reads, "Coronary artery disease—S.P. multiple surgical interventions." In his underlying, typewritten note, Dr. Levy stated, under the heading *"IMPRESSION,"* as follows: "Fellow with multiple medical problems as well as history of multiple injuries in the past." He said that it was obvious that Hersl had "severe heart disease" and that he would not be returning to full duty.

On November 7, 2006, Dr. Ciotola advised Dr. Lyons that surgery for "bilateral shoulder arthroscopy/subacrominal decompression/mini Munford and possible rotator cuff repair" was scheduled for November 22. On November 10, 2006, the Fire Department notified Hersl that his cutoff from that employment would be effective February 6, 2007. The surgery on November 22 did not proceed beyond the right shoulder. Dr. Ciotola found a partial rotator cuff tear that was repaired. In a note of December 6, with copy to Dr. Lyons, Dr. Ciotola described Hersl as "doing very well after his arthroscopic subacrominal decompression and mini open distill clavicle resection and his [SLAP] repair." Dr. Ciotola wanted to get Hersl back to full motion with his right shoulder before proceeding with surgery on the left shoulder.

Under date of January 8, 2007, Hersl applied for LOD disability retirement. In response to the question as to the cause of his disability, he stated, "I have a ruptured Achilles

tendon in my right leg, a torn rotator cuff in my left and right shoulder, and a deviated septum in my nose." Asked to describe the injury and how it happened, Hersl answered, "I slipped and fell down steps while carrying a heavy patient on a stretcher. I hurt my right leg, right & left shoulders, nose, left knee."

Dr. Ciotola saw Hersl on December 27, 2006, and February 13, 2007. On the latter date he completed, in longhand, a form for the Retirement Systems of the City of Baltimore headed, "Attending Physician's Statement of Disability." In response to a question concerning the patient's complaints, Dr. Ciotola stated that Hersl had "pain with overhead activities, push, pull, lift, carrying loads, cross body activities." Asked to describe Hersl's present condition and prognosis, Dr. Ciotola checked "physically incapacitated." Asked, "Is such incapacity likely to be *permanent*," Dr. Ciotola checked "Yes." (Emphasis added). Describing the effect of the impairment on the duties of the job, Dr. Ciotola opined: "Mr. Hersl is an active firefighter. Due to the injury to his arm + leg, he is totally unable to perform the duties of his job qualification. Percent of Disability 100%." Section 8 of the form dealt with cardiac limitations. Dr. Ciotola marked that section not applicable. The questionnaire also requested "the percentage of anatomical loss of use of any of the following functions or body parts caused by an accident, and the date of the accident which caused the loss." There followed a preprinted list of ten body functions or parts. Dr. Ciotola checked "Arm," "Leg," and "Vital Body Organ" after adding "Nose" to the latter. As to each, he rated 100%. In an office note of the February 13, 2007 visit, Dr. Ciotola recorded:

> "With regards to his shoulders, I did fill out his disability paperwork today as he has significant enough pathology and will not likely be able to return to full duty carrying his gear and climbing in and out of houses and so forth required by his job description."

Left shoulder surgery was performed on February 23, 2007. A follow-up appointment on March 15, 2007, revealed that the

incisions "looked great" and the "pain was decreased" in the left shoulder.

The Fire and Police Employees' Retirement System (Retirement System) requested that Hersl be examined by Dr. Louis S. Halikman, an orthopedic surgeon. He rendered a five-page report under date of March 29, 2007. Regarding the left knee pain, the doctor noted Hersl was injured in a 1998 non-LOD car accident for which he required surgery. The doctor continued:

> "His left knee is a serious problem. He stated that his knee was not appreciably symptomatic prior to the [February 5, 2006] accident.... He states that he is limited in his ability to walk. He cannot run or jog."

> "The patient's right knee is fine."

Dr. Halikman examined both shoulders and found limitation of motion. He examined x-rays of both shoulders and a "large package of documents" comprising the medical records, but they did not include the records of the shoulder surgery. He concluded:

> "It is my opinion that this gentleman is totally and permanently disabled from his job as a firefighter. He is disabled on the basis of several line of duty injuries involving his left knee as well as the recent line of duty injury which involves both of his shoulders. He had also sustained a right ankle Achilles tendon rupture but he has made an excellent recovery from that injury....

> "Nevertheless, it is my opinion that Mr. Hersl is totally and permanently disabled from his job as a firefighter due to line of duty injuries and disability retirement is recommended."

The Retirement System sent Dr. Halikman the additional medical records for review. In a letter dated April 6, 2007, he said, "My opinions are unchanged; I am recommending disability retirement for [Hersl]."

## II. The Administrative Hearing

An administrative hearing on Hersl's LOD disability claim was conducted on April 26, 2007, before a hearing examiner. Hersl was the only witness. He testified on direct and was subjected to a short cross-examination. Hersl's injuries from the February 5, 2006 LOD accident were discussed, as well as the heart attacks that spring and summer. The relevant medical records were placed in evidence.

The examiner then began a lengthy inquiry into Hersl's medical conditions. He focused principally on Hersl's heart condition, concluding that "[i]t is pretty obvious this present gentleman has severe heart disease." The examiner did comment, however, that "[w]e have no doctor who is saying that you cannot, that your disability is related to your heart." It is conceded the Retirement System did not require Hersl to be examined by a cardiologist prior to the administrative hearing.

In a five-page written opinion, dated the same day as the hearing, April 26, 2007, the examiner denied Hersl LOD disability retirement. His ultimate conclusions were:

"1. The Claimant has severe heart disease which totally and permanently incapacitates him for the further performance of the duties of his job classification;

"2. The physical incapacity is not a result of an injury arising out of and in the course of the actual performance of duty, without willful negligence on his part;

"3. The injuries to the Claimant's shoulders have been surgically repaired and there is insufficient evidence to find that such injuries are likely to be permanent; and

"4. The injury to the Achilles tendon has been repaired and there is evidence that convinces the hearing examiner that it no longer is a cause of incapability to perform the job classification."

The examiner stated that he gave "no weight to Dr. Ciotola's reports as indicating *permanency* of physical incapacity of the shoulders." He determined that "Dr. Ciotola's report of '100% anatomical loss of use of arm' is inconsistent with his

medical reports describing the effects of the surgery on the shoulders, which attest to successful repairs." The examiner rejected Dr. Halikman's medical opinion, for failure to provide evidence that

> "it is likely the physical incapacity caused by the LOD injuries to the shoulders will likely be permanent. He combines the shoulder injuries with several line of duty injuries involving his left knee which are not shown to have been caused by the February 5, 2006 LOD accident."

The decision concluded that "evidence of severe heart disease is sufficient to prove he is totally and permanently incapacitated for performance of his job classification." Thus, Hersl was entitled to a non-LOD disability retirement.

### III. Circuit Court Review

Judicial review of the agency's decision was conducted on October 15, 2007, in the Circuit Court for Baltimore City. That court framed the issue as follows:

> "The issue before the court is whether there is substantial evidence to support the hearing examiner's conclusion that there is insufficient evidence to find that the shoulder injuries are permanent. There is no basis to dispute the conclusion that any physical incapacity due to petitioner's heart disease is not the result of an injury arising out of and in the course of the employment. Nor is there any evidence that the injury to the Achilles tendon is the cause of any incapacity. Finally, there is no evidence in the record that the problems with petitioner's knee are due to a line-of-duty injury. Given those facts, the only basis for a finding in petitioner's favor is that the shoulder injuries permanently incapacitated petitioner from performance of his duties. On the other hand, if the injury to the shoulders did result in a permanent incapacity that prevents petitioner from performing the duties of his job classification, then petitioner is entitled to a finding in his favor, whether or not the heart disease would also incapacitate him."

The court concluded that both Dr. Ciotola's and Dr. Halikman's reports could be interpreted as opining that either the shoulder injuries alone caused the disability *or* the shoulder injuries combined with non-LOD injuries to the knee caused the disability. It was the court's understanding that the latter finding would result in a denial of benefits. Because the latter finding was supported by substantial evidence, grounds for reversal of the agency decision did not exist.

### Standard of Review

■ "In reviewing an administrative decision, such as the one before us, our role 'is precisely the same as that of the circuit court.' [*Department* ] *of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899 (1994). We review the decision of the administrative agency itself, *Ahalt v. Montgomery County,* 113 Md.App. 14, 20, 686 A.2d 683 (1996), and not the findings of fact and conclusions of law made by the circuit court. *Consumer Protection Division v. Luskin's, Inc.,* 120 Md.App. 1, 22, 706 A.2d 102 (1998), *rev'd in part on other grounds,* 353 Md. 335, 726 A.2d 702 (1999)."

*Board of Trustees for the Fire & Police Employees' Ret. Sys. v. Mitchell,* 145 Md.App. 1, 8, 800 A.2d 803, 807 (2002). The Court of Appeals discussed this standard in *Maryland Aviation Admin. v. Noland,* 386 Md. 556, 873 A.2d 1145 (2005):

"'A court's role in reviewing an administrative agency adjudicatory decision is narrow; it is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.

"'In applying the substantial evidence test, a reviewing court decides whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. A reviewing court must review the agency's decision in the light most favorable to it; ... the agency's decision is prima

facie correct and presumed valid, and ... it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence.

" 'Despite some unfortunate language that has crept into a few of our opinions, a court's task on review is *not* to substitute its judgment for the expertise of those persons who constitute the administrative agency. Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. Furthermore, the expertise of the agency in its own field should be respected.' "

*Id.* at 571–72, 873 A.2d at 1154 (quoting *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 67–69, 729 A.2d 376, 380–81 (1999) (internal quotation marks and citations omitted)).

■ This Court had made clear that "[a] reviewing court may, and should, examine any conclusion reached by an agency, to see whether reasoning minds could reasonably reach that conclusion from facts in the record before the agency, by direct proof, or by permissible inference. If the conclusion could be so reached, then it is based upon substantial evidence, and the court has no power to reject that conclusion." *Commissioner, Baltimore City Police Dep't v. Cason,* 34 Md.App. 487, 508, 368 A.2d 1067, 1079, *cert. denied,* 280 Md. 728 (1977). In doing so, a reviewing court may review "only the materials that were in the record before the agency at the time it made its final decision." *Department of Labor, Licensing & Regulation v. Boardley,* 164 Md.App. 404, 415, 883 A.2d 953, 960 (2005). "The final determination of the hearing examiner is presumptively correct and may not be disturbed on review except when arbitrary, illegal, capricious, or discriminatory." Baltimore City Code, Article 22, § 33(*l*)(12) (2008).

### Discussion

██ The Baltimore City Code, Article 22, § 34(e–1)(1) (2008), is the controlling statute regarding Hersl's LOD disability retirement claim. It provides:

"(e–1) *Line–of–duty disability benefits.*

"(1) A member shall be retired on a line-of-duty disability retirement if:

"(i) a hearing examiner determines that the member is totally and permanently incapacitated for the further performance of the duties of his or her job classification in the employ of Baltimore City, as the result of an injury arising out of and in the course of the actual performance of duty, without willful negligence on his or her part[.]"

██ Code § 33(*l*)(10)(i) places the burden on Hersl, as the moving party, to prove by a preponderance of the evidence "the nature and extent" of the disability and "that the disability prevents [Hersl] from the further performance of the duties of his ... job classification." Further, Hersl must show, by the same evidentiary standard, that the disability was "the result of an injury arising out of and in the course of the actual performance of duty, without willful negligence on the member's part." Code § 33(*l*)(10)(ii).

We shall now review Hersl's claim in the light most favorable to those agency findings that are supported by substantial evidence.

### Findings 1 and 2

The examiner's findings that severe heart disease totally and permanently incapacitated Hersl from the performance of his duties and that his heart disease is not a LOD disability are irrelevant to the issue before us. The issue here is whether injuries sustained in the February 5, 2006 LOD accident were permanent. It is undisputed that, if the injuries of February 5, 2006, were not permanently disabling, the Claimant would be entitled to a non-LOD disability retirement based on his heart condition. Nor does the Retirement Sys-

tem contend that, if the injuries of February 5, 2006, were permanently and totally disabling, it is permitted to terminate entitlement to the LOD disability retirement because the Claimant subsequently suffered heart attacks that were also totally and permanently disabling. *See Bowen v. Smith,* 342 Md. 449, 677 A.2d 81 (1996) (claimant's inability to work was caused by temporary total disability and not by subsequent incarceration); *Victor v. Proctor & Gamble,* 318 Md. 624, 569 A.2d 697 (1990) (claimant's inability to work was caused by temporary total disability and not by subsequent retirement).

### Finding 3

The issue in this case is finding 3: "The injuries to the Claimant's shoulders have been surgically repaired and there is insufficient evidence to find that such injuries are likely to be permanent[.]" We must determine whether there was substantial evidence to support this finding. Unlike the more typical cases in which the medical expert called by the employee and the medical expert called by the employer express conflicting opinions, the attending physician for the Claimant and the expert to whom the Claimant was referred by the Retirement System for an independent evaluation agree that Hersl is totally and permanently disabled as a result of LOD injuries suffered on February 5, 2006. Faced with that record, the examiner articulated a rationale for denying LOD retirement benefits that may be outlined as follows:

The burden is on the claimant to prove permanency.

Because there are some inconsistencies between the ultimate medical opinions and the medical records, the medical opinions that the injuries of February 5, 2006, resulted in permanent disability are rejected.

Therefore, the Claimant has not met his burden, and the claim is denied.

In reviewing this decision of the agency, our focus is on the period between February 5 and the latter part of May 2006, when Hersl suffered a massive heart attack. Resolution of the permanency issue in this case requires determining whether Hersl would have recovered from the injuries of February

5, had the heart attack not intervened, sufficiently to have resumed active duty as a firefighter. This is a complex medical question.

Well-established in Maryland law is the principle that a layperson is not qualified to render an expert opinion on a complex medical question. *See Aventis Pasteur, Inc. v. Skevofilax,* 396 Md. 405, 441, 914 A.2d 113, 134 (2007); *Johnson v. Zerivitz,* 234 Md. 113, 116, 198 A.2d 254, 255 (1964); *Craig v. Chenoweth,* 232 Md. 397, 400–01, 194 A.2d 78, 79 (1963); *Wilhelm v. State Traffic Safety Comm'n,* 230 Md. 91, 185 A.2d 715 (1962); *S.B. Thomas, Inc. v. Thompson,* 114 Md.App. 357, 689 A.2d 1301 (1997).

Here, Drs. Ciotola and Halikman were well aware of Hersl's heart attack; nevertheless, they independently concluded that Hersl was permanently disabled from performing the duties of a firefighter, based, not on the heart attack, but on the LOD injuries of February 5, 2006. Dr. Ciotola, as the treating surgeon, had personal knowledge of the extent of the damage to, and repair of, Hersl's shoulders. At no time, in describing in his reports the results of the shoulder operations, did Dr. Ciotola say that the Claimant, from the standpoint of his shoulders, would be fit for duty. The hearing examiner, nevertheless, said that Dr. Ciotola's opinion was inconsistent "with his medical reports describing the effects of the surgery on the shoulders, which attest to successful repairs." There is no statute requiring that a hearing examiner for the Retirement System be a doctor of medicine; nor is there any indication that the examiner in this case had special medical knowledge. Yet, the examiner presumed to substitute his lay opinion for that of the attending surgeon and to equate a good surgical result with fitness to resume the duties of a firefighter.[1] This substitution of a lay opinion for that of the medical expert is arbitrary.

---

1. Dr. Ciotola opined that the disability was permanent about ten days before performing the surgery on Hersl's left shoulder. Thus, his opinion included a prediction of the extent to which use of the left shoulder would be restored. The only report by Dr. Ciotola that is in

Illustrating the principle that an agency acts arbitrarily when its decision is not supported by substantial evidence is *Adams v. Board of Trustees of Employees' Retirement Sys. of City of Baltimore*, 215 Md. 188, 137 A.2d 151 (1957). There, a firefighter sought accidental retirement benefits. He produced substantial evidence that he sustained a severe back injury while carrying a rescue victim up a flight of stairs. *Id.* at 190, 137 A.2d at 152. The agency, by a divided vote, denied accidental disability benefits, based upon a medical record showing that the claimant had lumbago almost seven years prior to the accident in issue. The Court of Appeals held that the action of the agency was arbitrary because it was not supported by substantial evidence. *Id.* at 195–96, 137 A.2d at 155. Here, similarly, there is no competent evidence to rebut the medical opinions that Hersl's LOD disability is permanent.

A similar situation arose in *Board of Trustees v. Rollins*, 269 Md. 722, 309 A.2d 758 (1973). In that case, Rollins, a long serving police officer, was injured in a car accident while on duty and suffered severe back pain. Rollins applied for special disability benefits, which were denied despite all medical reports determining that he was disabled from that LOD injury. The Court of Appeals affirmed a rejection of the agency's determination. After reviewing the pertinent medical records, the Court stated that

> "there was no real dispute as to the essential facts, and no unequivocal evidence on the question of causation, save Dr. Vollmer's testimony, which supported Rollins' contention. There was no basis for the exercise of judgment or discretion by the Board, and when the Board denied Rollins' claim for special disability benefits, its conclusion, unsupported by the evidence, was arbitrary, and should have been vacated below, as it was."

*Id.* at 732–33, 309 A.2d at 764.

 Although the standards for eligibility for disability benefits under the Social Security system differ from those of

---

. the record and made after the surgery on the left shoulder says simply that the "incisions look great" and that the "pain is decreased."

the Retirement System, cases decided under the Social Security Act are helpful with respect to the role of a hearing examiner. In *Stallins v. Celebrezze*, 227 F.Supp. 138 (W.D.Ky.1964), the court said that "the Hearing Examiner is not at liberty to make a medical judgment regarding plaintiff's limitation of capacity where such an inference is not clearly justified by the clinical findings." *Id.* at 141. *See also Gosley v. Harris*, 1980 U.S. Dist. LEXIS 17508 (E.D.Pa. Jan. 15, 1980) ("Although the ALJ should consider the objective medical facts, he is not at liberty to make a medical judgment regarding plaintiff's limitation of capacity where such an inference is not clearly justified by the clinical findings.").

These limitations on the role of a hearing examiner in Social Security disability cases were explained in *Underwood v. Ribicoff*, 298 F.2d 850 (4th Cir.1962):

"The objective medical findings may show more or less clearly the existence of certain clinically determinable physical or mental impairments. However, a recitation of objective, clinical findings will seldom show, without more, the over-all effect of these impairments on a particular individual. This is a matter of medical judgment to be decided with reference to the individual's general physical condition and the state of development of each of the defects. The expert medical opinion of treating or examining physicians on these subsidiary questions of fact will in most cases be essential in determining with respect to a particular individual the severity of an objectively determinable physical impairment."

*Id.* at 851.

The hearing examiner summarized his reasons for rejecting the evidence from Dr. Halikman as follows:

"Neither does Dr. Halikman provide evidence that it is likely the physical incapacity caused by the LOD injuries to the *shoulders* will likely be permanent. He combines the shoulder injuries with several [non-]line of duty injuries involving his left knee which are not shown to have been

caused by the February 5, 2006 LOD accident." [2]

The first quoted sentence contains an error of law. Dr. Halikman's expert opinion constitutes evidence of permanency. In addition, it is clear from Dr. Kanner's report of April 11, 2006, that the Claimant injured his knees in the February 5, 2006 LOD accident. The second quoted sentence is the basis for the argument by the Retirement System in this Court. That argument does not focus on permanency. Rather, the appellee submits: "[T]he hearing examiner could reasonably discount Dr. Halikman's opinion and determine that it did not support the proposition that the shoulder injuries *alone* caused permanent disability." Appellee's Brief at 11 (emphasis added). The analysis of the circuit court was similar. That court said that "the hearing examiner could reasonably conclude that the medical opinions in the record failed to sustain petitioner's burden to demonstrate that the injury to his shoulders *by itself* was such as to render him permanently incapable of performing his duties." (Emphasis added). Because Dr. Ciotola indicated a 100% disability of the leg on the form that he sent to the Retirement System, we shall consider that this argument by the appellee applies to Dr. Ciotola's opinion as well.

The Code, Article 22, § 34(e–1)(1)(i) requires for eligibility that the incapacitation be "as the result of an injury arising out of and in the course of the actual performance of duty[.]" No one contends that "an injury" is limited to the singular. The issue is one of proximate causation. The argument of the Retirement System seems to be that, because both doctors included the knee when expressing their opinions of permanency, and because there was evidence of two prior injuries to the left knee, the permanency found by the medical experts is not attributed *solely* to the injuries of February 5, 2006. In other words, the appellee submits that the proximate cause of an LOD permanent disability must be an exclusive cause.

---

**2.** The Retirement System emphasizes the two earlier, non-LOD accidents in which Hersl suffered a knee injury. We believe that the hearing examiner intended to refer to these earlier accidents.

Although there is evidence of *injuries* to Hersl's left knee prior to February 5, 2006, there is no evidence that he suffered from *any occupational disability* of the knee on the day of the LOD accident. He was on active duty and performing the duties of a firefighter when he was injured, including injuries to the shoulders and knees. The Retirement System has not referred us to any court decision holding that the ordinary principles of proximate causation in compensation cases do not apply to LOD disability retirements. Nor has the Retirement System referred us to any portion of the Baltimore City Code, other than the above-quoted § 34(e–1)(1)(i), on which its argument is based. We see nothing in that section indicating a legislative intent that, in order to be eligible for a LOD disability pension, a claimant, who is injured while fully performing the duties of his job classification, must never have suffered a prior, non-LOD injury to the body part involved in the claim. *See Adams*, 215 Md. 188, 137 A.2d 151 (prior lumbago).

In resolving causation questions under this Baltimore City pension plan, the Court of Appeals has found analogies to workers' compensation cases frequently to be helpful. *Heaps v. Cobb*, 185 Md. 372, 383, 45 A.2d 73, 78 (1945); *Board of Trustees v. Grandinetti*, 269 Md. 733, 738, 309 A.2d 764, 766–67 (1973). In the workers' compensation field, a question similar to that before us was presented in *Congoleum Nairn v. Brown*, 158 Md. 285, 148 A. 220 (1930). The claimant in that case had suffered industrial accident injuries on two occasions prior to the claim that is the subject of the reported case. In the earliest accident, he lost a leg below the knee. In the second of the earlier accidents, he lost the index and second fingers of his left hand. In the subject accident, he lost the third and fourth fingers and two-thirds of the second finger of his right hand. The Court of Appeals adopted the rule "that the consequences to the particular workman determine the degree of disability, so that if an injury deprives him of all the capacity he has left after a previous accident, that result might be classed as total disability from the injury." *Id.* at 291, 148 A. at 222.

Alternatively, if the Retirement System's theory is that a preexisting, non-LOD *occupational disability* of the knee proximately caused Hersl's total disability, that theory is not supported by the medical evidence.

For these reasons, we reverse.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF AN ORDER REMANDING THIS CASE TO THE APPELLEE FOR THE ENTRY OF AN ORDER AWARDING THE APPELLANT A LINE–OF–DUTY PERMANENT DISABILITY PENSION.**

**COSTS TO BE PAID BY THE APPELLEE.**