517 A.2d 741

**STATE of Maryland**

v.

**William Alfred ALLEWALT.**

**No. 63, Sept. Term, 1985.**

Court of Appeals of Maryland.

Nov. 25, 1986.

Ann E. Singleton, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellant.

Julia Doyle Bernhardt, Asst. Public Defender (Alan H. Murrell, Public Defender and Julia Doyle Bernhardt, Asst. Public Defender, on brief), Baltimore, for appellee.

Before MURPHY, C.J., and SMITH,* ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

* SMITH, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Art. IV, Sec. 3A, he also participated in the decision and the adoption of this opinion.

RODOWSKY, Judge.

In this rape prosecution the defense was consent. A psychiatrist, called by the State in its rebuttal case, testified that the victim suffered from post-traumatic stress disorder (PTSD) and that in his opinion, based on the history furnished to him, the cause of the disorder was the rape complained of by the victim. The Court of Special Appeals reversed, concluding that the probative value of the evidence was outweighed by unfair prejudice. *Allewalt v. State*, 61 Md.App. 503, 487 A.2d 664 (1985). This Court granted cross-petitions for certiorari. For reasons hereinafter stated, we shall reinstate the judgment of conviction.

The incident in question occurred in the early morning hours of Saturday, June 25, 1983, in the victim's home. The defendant, William Alfred Allewalt (Allewalt), a six-foot, 160–pound, twenty-year-old, was employed as a tire changer. The prosecutrix, Mrs. Mary Lemon (Lemon), age thirty-six, five-feet-eight-inches, 138–pounds, worked as a beautician. Allewalt was the live-in boyfriend of Mrs. Lemon's eighteen-year-old daughter, Charlene. When Charlene was fifteen she had become pregnant by Allewalt and had had an abortion. Unknown to Allewalt at the time of the incident, Charlene was again pregnant by him. The household occupied a two-story townhouse. Mrs. Lemon, who was separated from her husband, used the master bedroom on the second floor; Charlene and Allewalt occupied a bedroom in the basement; another daughter, Evonne, age fourteen, had a small bedroom on the second floor; two toy poodles owned by Mrs. Lemon slept in her bedroom; and a Doberman pinscher puppy, a gift from Allewalt to Charlene, lived in the basement. Habitually, the older of those poodles would attempt to bite Allewalt in the legs.

Around midday of Friday, June 24, Charlene and Allewalt had quarreled at the Lemon home. Charlene and Evonne spent the balance of Friday visiting at their aunt's house, where they stayed overnight. Allewalt and a male friend spent Friday evening drinking in various bars and Allewalt

estimated that he consumed fifteen to twenty bottles of beer that night. Mrs. Lemon spent the evening at home, watching television in her bedroom, and retired about 11:00 p.m.

Allewalt, intoxicated, returned to the Lemon residence at about 3:00 a.m. When he noticed that the puppy had been left unattended, he went to Mrs. Lemon's bedroom door, knocked, and awakened her. They conversed briefly in the doorway about the puppy and about when Charlene would return. What happened next was the subject of conflicting evidence.

Mrs. Lemon testified that Allewalt then forced his way into her bedroom. She told him not to do what he was thinking. There was a struggle and Mrs. Lemon's back struck the jam of the bedroom door. Allewalt, reaching around Mrs. Lemon from the rear, seized her by the arms, picked her up, and carried her from her bedroom, where her poodles were left confined, down the hall to Evonne's bedroom. In the course of a struggle in the hall, a framed picture was knocked from the wall and the glass shattered on the floor. Allewalt threw Mrs. Lemon on Evonne's bed and raped her. After Allewalt left the room and Mrs. Lemon no longer heard him moving in the house, she went next door to her neighbors, James and Patricia Bailey.

Allewalt testified that the conversation ended in the hall, after Mrs. Lemon had closed her bedroom door from the outside because her poodles were barking. He said that she turned off the hall light by a switch next to her bedroom door and in the darkness put her arm around his waist. He put his arm around her waist and the two, side by side, went down the hall to Evonne's bedroom. His staggering caused them to brush against the picture which was knocked from the wall. They fell across the bed. Without any conversation, but with Allewalt reading Mrs. Lemon's "body language," they engaged in sexual intercourse. After penetration and ejaculation Mrs. Lemon pushed against Allewalt's chest and told him to stop. He returned to the

basement where he slept briefly. When he was awakened by the poodles barking, he briefly looked for Mrs. Lemon and then spent the balance of the night at the home of his drinking companion. Allewalt returned to the unoccupied Lemon home shortly after daylight Saturday morning, showered, dressed, and went to work. He had a discussion with his employer who telephoned the police and learned that Allewalt was accused of rape. Allewalt waited for an officer to come to make the arrest.

The neighbor, James Bailey, testified that early in the morning of Saturday, June 25, he heard through the common wall Allewalt saying, "Come on. Come on," and that he heard Mrs. Lemon yell, "Help me. Help me. Stop." Mr. and Mrs. Bailey each described Mrs. Lemon, when she came to their house, as hysterical, with red marks on her wrists and the seam of her robe torn at the shoulder. The first police officers to arrive described Mrs. Lemon as very upset, almost incoherent, nearly hysterical, crying, with raw, reddish marks on her arms. A physician who examined Mrs. Lemon at a hospital at approximately 6:00 a.m. described her as quietly sobbing. That doctor found faint bruises on Mrs. Lemon's back and purple bruises on both elbows.

Prior to the State's rebuttal case the circuit court conducted a hearing out of the presence of the jury in order to decide whether to admit into evidence certain opinion testimony from Dr. Michael Spodak, a forensic psychiatrist, concerning PTSD. At the conclusion of the questioning defense counsel objected on the ground that the jury did not need help from an expert in deciding so basic an issue as consent and on the further ground that under the *Frye-Reed* test PTSD induced by rape "has not been recognized in the State of Maryland as being generally accepted within the scientific community...."[1] The court ruled that PTSD "has been around for a long time," is "nothing new," and is

---

1. The reference is to *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923) and *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978).

"recognized." The court thought Dr. Spodak "will be able to assist that jury in making a determination as to [Mrs. Lemon's] state of mind at the time of the event on the basis of post event findings."

The State then recalled Mrs. Lemon. She testified that following June 25, 1983, her nerves got worse, she cried all the time and could not eat. When she closed her eyes or tried to sleep, she could see Allewalt standing in the doorway of her bedroom dressed as he was on the night of the occurrence. Following that night she has been wondering if neighbors, friends, and acquaintances thought she was "cheap," or if she was "dressing cheap," or if they were looking at her out of their windows when she came out of her home. She was uncomfortable around young males and particularly when she was alone with a young man with whom Charlene had begun keeping company.[2] Generally Mrs. Lemon would not leave the house other than to go to work. Cross-examination developed that in March of 1983 Mrs. Lemon had begun receiving treatment for depression once a week at a mental health clinic and had been taking an anti-depressant, amitriptyline, as well as valium. Prior to June 25 her nerves were "bad" and she occasionally had crying spells.

Dr. Spodak explained to the jury that PTSD "is a condition recognized in psychiatry as the emotional reaction to a traumatic event." The characteristics of PTSD include: insomnia, exaggerated startle response, feelings of guilt, loss of appetite and of weight, avoidance of reminders of the traumatic event, and a sense of fearfulness. A person with PTSD can also experience nightmares and flashbacks, usually relating to the traumatic event. Dr. Spodak explained that the condition has been identified as long ago as

---

2. By the time of trial in November 1983 Charlene was again living with Allewalt, but at Allewalt's mother's home. Charlene was a witness called by the defense at the rape trial. Her testimony, contrary to that of Mrs. Lemon, included reference to a lock on the inside of the door of the bathroom off of Mrs. Lemon's bedroom and to objects in that bathroom which potentially were defensive weapons.

the turn of the century but that the terminology has varied. In World War I it was called "shell shock," later "gross stress reaction," and in the most recent psychiatric manual, DSM III, the condition is labeled post-traumatic stress disorder.[3] PTSD can be caused by physical trauma such as an automobile accident or rape or by emotional trauma without specific physical injury.

Dr. Spodak had examined Mrs. Lemon on October 13, 1983, at the request of the State in order to testify at the rape trial. He conducted a standard psychiatric examination which included taking a psychiatric history, making observations in a mental status examination, obtaining some psychological tests, and reviewing the police report and a medical examination report. In Dr. Spodak's opinion Mrs. Lemon suffered the mental disorder of PTSD after June 25, 1983. That opinion was based "for the most part" on the history which she reported to him. Dr. Spodak was asked by the State, "[B]ased on what she told you, what would be the trauma that forms the basis for your opinion?" He replied that "[t]he only trauma that she claims that she went through at that time was being raped." The witness explained that while Mrs. Lemon had undergone some depression and lost some weight as a result of her marital difficulties she was "adjusting to that whole experience when the second trauma occurred in June. After that, she definitely took an emotional nosedive...." When asked if the break up of Mrs. Lemon's marriage of sixteen years would "be considered a traumatic event such that it would give rise to" the diagnosis, Dr. Spodak replied:

No. First of all, it is not the type of trauma that gives rise to this diagnosis at all. It is more of a stressful situation that can cause a stress reaction with depression and anxiety and so on, but it doesn't cause nightmares and flashbacks and [avoidance] behavior and being uncomfortable around young males and so on. So, for

---

**3.** The reference is to American Psychiatric Assoc., *Diagnostic & Statistical Manual of Mental Disorders* (3d ed. 1980).

starters, it just doesn't account for this kind of reaction, and it certainly would be most unusual, if it were to occur at all, to occur three months down the road. If it was going to occur, you would expect it right after the incident. But, as I say, it doesn't cause this kind of reaction at all.

On cross-examination the witness acknowledged that "almost any trauma" could cause the condition. The trauma need not be life threatening. He knew of one case where the patient's unjustified arrest for shoplifting had precipitated PTSD. He reiterated that a slow break up of a marriage would not produce the disorder. It requires a direct, sudden shock like coming home and finding the furniture gone or finding one's spouse in bed with someone else. Defense counsel also asked if the examining psychiatrist would have to believe that a traumatic event took place. Dr. Spodak answered:

A I think it is more important that the individual reporting, that is the patient or person you are evaluating, believes that it took place. But, yes, I think, the whole diagnosis is predicated on the assumption that some traumatic incident occurred, sure.

Q So the diagnosis essentially is predicated on a belief in what the patient indicates to you took place?

A Well, it is that coupled with, because we are constantly called upon to answer the question of whether, especially in work related incidents of trauma, are people malingering or not. If they describe the things that are well recognized in the textbooks as going with the condition and describe the time sequence which matches what is known about the condition, and in this case it is pretty solid evidence that they are giving you the straight scoop, if you will. So, yes, it is true that one has to presume that the trauma actually occurred. But there are a lot of other ways of in a sense checking out a story that has to do with what is known about the condition.

The jury found Allewalt guilty of second-degree rape, common law assault, and sexual offense in the fourth degree. The court imposed concurrent sentences of ten years imprisonment, with five years suspended, for the rape conviction and of eighteen months imprisonment for each of the other two offenses.

The Court of Special Appeals recognized that evidence of PTSD "is relevant and material insofar as any information tending to support an inference of consent or lack of consent affects the ultimate determination of whether a rape occurred." 61 Md.App. at 514, 487 A.2d at 669. Nevertheless the court concluded that "[d]espite the satisfaction of these requirements, PTSD testimony remains inadmissible because of the prejudicial impact it has on a rape case." *Id.* The court said that the diagnosis "does not reliably prove that a victim did not consent to sexual intercourse, but only indicates that the victim displays certain symptoms." *Id.* The court pointed out that "[w]hile evidence of PTSD may be relevant to prove the victim's resulting injury, it does not establish that rape was the trauma causing it." (Footnote omitted). Consequently, said the court, the "diagnosis has little probative value" on the issue of "whether a rape caused the disorder." *Id.* at 515–16, 487 A.2d at 670. This "limited" probative value was held to be outweighed by prejudice.

> The court explained the prejudice to be that
> expert testimony regarding PTSD unduly corroborates the victim's rendition of the incident. By stating that a rape *could* cause the disorder, an expert implicitly verifies the victim's claim that the rape *did* cause it. This leads to confusion as to the issue being decided and creates the perception that no further factfinding is necessary. *See, State v. Taylor*, [663 S.W.2d 235 (Mo.1984) ]; *State v. Saldana*, [324 N.W.2d 227 (Minn.1982) ]; *State v. McGee*, [324 N.W.2d 232 (Minn.1982) ]. [*Id.* at 516, 487 A.2d at 670 (italics in original).]

The court concluded

the evidence proves only the result of a trauma, and does not *conclusively establish* the type of trauma. Hence, the introduction of PTSD into evidence constitutes reversible error. [*Id.* (emphasis added).]

I

The analysis by the Court of Special Appeals erects an unreasonably high standard for the admissibility of medical opinion evidence. The analysis also mischaracterizes the evidence in this case as if the medical opinion had been presented as a scientific test the results of which were controlled by inexorable, physical laws. Further, the analysis ignores Dr. Spodak's opinion that, based on the history, the stressor causing PTSD in Mrs. Lemon following June 25, 1983, was what she said was a rape occurring on that day.

The basic admissibility of Dr. Spodak's testimony is controlled by *Beahm v. Shortall,* 279 Md. 321, 368 A.2d 1005 (1977). There we overruled *Parker v. State,* 189 Md. 244, 55 A.2d 784 (1947). Under *Parker* the admissibility of medical opinions based upon the patient's narrative of subjective complaints had been limited to opinions rendered by attending physicians thereby excluding the opinions of physicians engaged only to testify, as was Dr. Spodak in this case. *Beahm* permits the physician who examined a patient in order to qualify as an expert witness to present his medical conclusions and the information, including history and subjective symptoms, received from the patient which provide the basis for the conclusions.[4] Dr. Spodak's opinion that

---

4. Under *Beahm* the conclusions are admissible as substantive evidence, but "[t]he statements made by the patient, as narrated by the physician, are admissible, with a qualifying charge to the jury, only as an explanation of the basis of the physician's conclusions and not as proof of the truth of those statements." 279 Md. at 327, 368 A.2d at 1009 (footnote omitted). The limitation is not a factor here. Mrs. Lemon testified to the significant history. Defense counsel, on cross-examination of Mrs. Lemon, elicited the defense's competing stressor, *i.e.,* marital separation and resulting depression. Dr. Spodak was present in court, heard Mrs. Lemon's testimony, and included it as a basis for his opinion. In addition, defense counsel had limited the

the PTSD which he diagnosed in Mrs. Lemon was caused by the rape which she described is as evidentiarily reliable as an opinion by an orthopedist who has been engaged only to testify ascribing a plaintiff's subjective complaints of low back pain to soft tissue injury resulting from an automobile accident described in the history given by the plaintiff. Maryland evidence law recognizes such medical opinions to be competent on, and relevant to, the issue of causation in addition to the fact of bodily harm.[5]

There is no issue in this case over the fact that psychiatrists and psychologists recognize PTSD as an anxiety disorder. It is diagnostic category 309.81 in DSM III. Its "essential feature is the development of characteristic symptoms following a psychologically traumatic event that is generally outside the range of usual human experience." *Id.* at 236.

> The stressor producing this syndrome would evoke significant symptoms of distress in most people, and is generally outside the range of such common experiences as simple bereavement, chronic illness, business losses, or

---

objections to Dr. Spodak's testimony by specifying the grounds for the objection and those grounds had not included hearsay. Finally, no limiting instruction was requested either at the time the evidence was admitted or in the charge to the jury.

**5.** In its *Allewalt,* the Court of Special Appeals said:

> Our exclusion of expert testimony regarding PTSD in criminal cases does not mean that it may not be relevant and material in a civil action for damages. A court could find that such evidence is probative of damages, but we do not decide that issue at this juncture. [61 Md.App. at 515–16 n. 10, 487 A.2d at 670 n. 10.]

Cases allowing PTSD evidence to prove the extent of injury in civil proceedings brought by rape victims include: *Redmond v. Baxley,* 475 F.Supp. 1111 (E.D.Mich.1979); *Division of Corrections v. Wynn,* 438 So.2d 446 (Fla.Dist.Ct.App.1983); *Alphonso v. Charity Hospital,* 413 So.2d 982 (La.Ct.App.1982); *White v. Violent Crimes Compensation Board,* 76 N.J. 368, 388 A.2d 206 (1978); *Skaria v. State,* 110 Misc.2d 711, 442 N.Y.S.2d 838 (N.Y.Ct.Cl.1981); *Wesley v. Greyhound Lines, Inc.,* 47 N.C.App. 680, 268 S.E.2d 855 (1980).

Use of a description of PTSD in defense of a civil case is reported in *Wilson v. Jackson,* 66 Md.App. 744, 505 A.2d 913 (1986).

marital conflict. The trauma may be experienced alone (rape or assault) or in the company of groups of people (military combat). [*Id.*]

DSM III, at 238, presents four categories of diagnostic criteria for PTSD, the first of which is the "[e]xistence of a recognizable stressor that would evoke significant symptoms of distress in almost everyone." [6] Consequently, Dr. Spodak was acting well within the field of his special training and experience not only when he made the diagnosis but, since the diagnosis requires identifying the "recognizable stressor," when he opined that the trauma was the rape described by the patient.

---

**6.** The other diagnostic criteria are:
 B. Reexperiencing of the trauma as evidenced by at least one of the following:
 (1) recurrent and intrusive recollections of the event
 (2) recurrent dreams of the event
 (3) sudden acting or feeling as if the traumatic event were reoccurring, because of an association with an environmental or ideational stimulus
 C. Numbing of responsiveness to or reduced involvement with the external world, beginning some time after the trauma, as shown by at least one of the following:
 (1) markedly diminished interest in one or more significant activities
 (2) feeling of detachment or estrangement from others
 (3) constricted affect
 D. At least two of the following symptoms that were not present before the trauma:
 (1) hyperalertness or exaggerated startle response
 (2) sleep disturbance
 (3) guilt about surviving when others have not, or about behavior required for survival
 (4) memory impairment or trouble concentrating
 (5) avoidance of activities that arouse recollection of the traumatic event
 (6) intensification of symptoms by exposure to events that symbolize or resemble the traumatic event[.]
The purpose of stating diagnostic criteria in DSM III was to facilitate communication and research between mental health professionals by "standardizing the classification system with reference to empirically demonstrable phenomena." Comment, *The Psychologist as Expert Witness: Science in the Courtroom?*, 38 Md.L.Rev. 539, 580 n. 207 (1979).

 Read literally, the opinion by the Court of Special Appeals would require Dr. Spodak's opinion to "establish" that a rape had occurred and indeed, to establish that fact "conclusively." A slavish application of so rigid a requirement would eliminate most of the evidence at trials of all kinds. We said in *Dorsey v. State,* 276 Md. 638, 643, 350 A.2d 665, 668–69 (1976) that

> [t]he real test of admissibility of evidence in a criminal case is "the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue." *MacEwen v. State,* 194 Md. 492, 501, 71 A.2d 464, 468 (1950); *Pearson v. State,* 182 Md. 1, 13, 31 A.2d 624, 629 (1943). In *Kennedy v. Crouch,* 191 Md. 580, 585, 62 A.2d 582, 585 (1948), our predecessors stated it to be "an elementary rule that evidence, to be admissible, must be relevant to the issues and must *tend* either to establish or disprove them." [Emphasis added.]

The determination of the relevance of specific evidence within the circumstances of a given case rests with the discretion of the trial court. *Johnson v. State,* 303 Md. 487, 527, 495 A.2d 1, 21 (1985). Where the proffered evidence is competent opinion testimony, the trial court must also determine, in its discretion, whether the opinion and reasons for it will aid the trier of fact. *Consolidated Mechanical Contractors, Inc. v. Ball,* 263 Md. 328, 338, 283 A.2d 154, 159 (1971). Here the trial judge concluded that Dr. Spodak's diagnosis of PTSD, coupled with his opinion on the cause of that disorder, would aid the jury. We have said "that the causes of emotional disturbances are complicated medical questions, proof of which must be made by expert medical testimony." *Johnson v. Zerivitz,* 234 Md. 113, 116, 198 A.2d 254, 255 (1964). And compare *Board of Trustees v. Rollins,* 269 Md. 722, 309 A.2d 758 (1973) (payment of special disability benefits properly ordered where medical opinion finding functional overlay was uncontradicted) with *Wilhelm v. State Traffic Safety Commission,* 230 Md. 91, 101, 185 A.2d 715, 719 (1962) (absent expert testimony, the

issue of the causes of the plaintiff's emotional disturbances properly withheld from jury).

■ The Court of Special Appeals nevertheless held that the trial judge had abused his discretion in admitting the expert testimony because prejudice was said to outweigh the probative value of Dr. Spodak's opinion. The finding of overriding prejudice rested on the assumption that the jury would be confused and might conclude that, because rape was one of the possible causes of PTSD, it had in fact caused the disorder found in Mrs. Lemon. As we have set forth, *supra*, Dr. Spodak not only gave his diagnosis and identified the described rape as the cause of the disorder but he also explained his opinion on causation by reference to the history obtained from Mrs. Lemon and by excluding other possible causes. Prejudice in the evidentiary sense which can outweigh probative value involves more than damage to the opponent's cause. *See McCormick on Evidence* § 185, at 545 (3d ed. 1984).

All evidence introduced against a defendant, if material to an issue in the case, tends to prove guilt, but is not necessarily prejudicial in any sense that matters to the rule of evidence.... Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence.... The prejudicial effect may be created by the tendency of the evidence to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant. [*United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir.1980).]

We find nothing in the record now before us which justifies the Court of Special Appeals' apparent concern that Dr. Spodak was presenting a kind of mystical infallibility. He did not purport to have invented a scientific test for determining consent to sexual intercourse had months earlier. He did claim that he could use his special knowledge and the interviewing techniques of his profession to diagnose whether Mrs. Lemon, at the time of his examination of her, suffered from a medically recognized anxiety disorder.

He did not claim that psychiatry could demonstrate conclusively that the cause of the PTSD was rape. He did claim the special knowledge and experience to be able to identify the cause of the PTSD by utilizing the history furnished by the patient, a utilization permitted under our holding in *Beahm, supra,* 279 Md. 321, 368 A.2d 1005. Having heard the evidence the jury still had to evaluate the credibility of Mrs. Lemon and of Dr. Spodak, and to evaluate what weight, if any, they would give to his opinion. Indeed the trial judge instructed the jury that it "should give experts' testimony the weight and value you believe it should have. You are not required to accept any expert's opinion."

By holding on the present record that the trial court abused its discretion the Court of Special Appeals has in effect excluded PTSD evidence as a matter of law in every rape case in which consent is the ultimate issue. The court cited decisions of the supreme courts of Minnesota and Missouri in support of the holding of overriding prejudice. Allewalt, in his brief to this Court, also puts the question presented in absolute terms by further contending that PTSD evidence is not accepted in the relevant scientific community "as a reliable means of identifying the underlying trauma." Phrased in that form Allewalt's argument simply erects a strawman. That argument is like saying a medical diagnosis of a broken bone is not accepted in the relevant scientific community as a reliable means of identifying the underlying trauma (or disease) which caused the break. The appropriate inquiry in the present case is whether there is some policy applicable to evidence offered in rebuttal of consent in a rape case which prevents a qualified psychiatric witness from expressing an opinion, based on the patient's history, as to the cause of a recognized disorder, PTSD, from which, in the expert's opinion, the patient suffers.

The cases relied upon by the Court of Special Appeals and by Allewalt dealt with testimony about "rape trauma syndrome" (RTS). The quoted expression had its origin in an article by Burgess & Holmstrom, *Rape Trauma Syn-*

*drome,* 131 Am.J.Psychiatry 981 (1974) in which the authors reported on a study of those patients admitted during a one-year period to the emergency department of Boston City Hospital who presented a complaint of having been raped. RTS is the terminology used by some for a PTSD subset in which the trauma is rape. Consequently one of the diagnostic criteria of PTSD, namely that the trauma be reexperienced, would in such cases involve a reexperiencing of the sexual assault.

In *State v. Saldana,* 324 N.W.2d 227 (Minn.1982), the expert witness was the director of a victim assistance program who held a bachelor's degree in psychology and social work. The witness "explained the stages that a rape victim typically goes through and discussed typical behavior of victims after a rape." *Id.* at 229. The witness "stated that [the complainant] was the victim of 'acquaintance rape,' that [the witness] definitely believed [the complainant] was a victim of sexual assault and rape, and that she did not think [the complainant] fantasized or 'made it up.' " *Id.* The court analogized to its earlier rejection of "battering parent syndrome" evidence, in that "scientific evaluation of rape trauma syndrome has not reached a level of reliability that surpasses the quality of common sense evaluation present in jury deliberations." *Id.* at 230. In the court's opinion "[p]ermitting a person in the role of an expert to suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the complainant was therefore raped, unfairly prejudices the appellant by creating an aura of special reliability and trustworthiness." *Id.*

A companion case, *State v. McGee,* 324 N.W.2d 232 (Minn. 1982), held to be inadmissible, for the reasons set forth in *Saldana,* a physician's testimony that the complainant's symptoms were consistent with RTS. In a later sexual assault case the Supreme Court of Minnesota approved the admission of evidence concerning the complainant's physical and emotional condition shortly after the incident because that evidence tended to corroborate the victim's testimony.

The court distinguished *McGee* and *Saldana* as cases which "dealt with admission of expert testimony of rape trauma syndrome to establish that a rape occurred." *State v. Booker,* 348 N.W.2d 753, 755 (Minn.1984).

The Supreme Court of Missouri has also held that RTS evidence is not admissible. *State v. Taylor,* 663 S.W.2d 235 (Mo.1984). There the witness, a psychiatrist, had examined the complainant about three months after the assault. He explained RTS to the jury and testified that identifiable symptoms of RTS develop in nearly ninety-five percent of all rape and sexual assault victims. He opined that the complainant suffered from RTS brought on by the rape incident which she described to him. He further testified that the victim "was not fantasizing when she described the rape...." *Id.* at 237. The court held that the psychiatrist's

> statements that the prosecutrix suffered from rape trauma syndrome and that she had been raped are not sufficiently based on a scientific technique, which is either parochially accepted or rationally sound, to overcome the inherent danger of prejudice created by his status as an expert.
>
> There are inherent implications from the use of the term "rape trauma syndrome", for it suggests that the syndrome may only be caused by "rape" as the court in *Saldana, supra,* emphasized. [*Id.* at 240.]

It was the court's further view that, inasmuch as the "trauma syndrome could result from a number of stressful situations ... it would be too presumptuous for [the witness] to designate the particular experience." *Id.*

The same result was reached by the Supreme Court of California in *People v. Bledsoe,* 36 Cal.3d 236, 681 P.2d 291, 203 Cal.Rptr. 450 (1984). In that rape prosecution a rape counselor had testified in the state's case in chief and stated that the complainant suffered from RTS. The court recognized that some courts have allowed evidence on RTS to rebut an inference that the conduct of the complainant was

inconsistent with a rape by providing the jury recent findings of professional research on the subject of victims' reactions to sexual assault.[7] The court also said RTS evidence could play a useful role in disabusing the jury of widely held misconceptions about rape and rape victims. But in the case before it the court said the RTS testimony was introduced "as a means of proving—from the alleged victim's post-incident trauma—that a rape in the legal sense had, in fact, occurred." 36 Cal.3d at 248, 681 P.2d at 299, 203 Cal.Rptr. at 458. Unlike a blood test, RTS "was not devised to determine the 'truth' or 'accuracy' of a particular past event—i.e., whether, in fact, a rape in the legal sense occurred—but rather was developed by professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors' clients or patients." *Id.* at 249–50, 681 P.2d at 300, 203 Cal.Rptr. at 459. Because RTS "is not generally recognized or used in the general scientific community from which it arose ... to prove that a rape in fact occurred," the court held that evidence of RTS could not be used "for that purpose in a criminal trial." *Id.* at 251, 681 P.2d at 301, 203 Cal.Rptr. at 460.

At least an equal number of state supreme courts take the opposite view. *State v. Marks*, 231 Kan. 645, 647 P.2d 1292 (1982) involved the testimony of a psychiatrist from the Menninger Foundation who had examined the complainant two weeks after the alleged rape. Recognizing that "[t]he identification of rape trauma syndrome is a relatively new psychiatric development," the court nevertheless said that "if the presence of rape trauma syndrome is detectable and reliable as evidence that a forcible assault did take place, it is relevant when a defendant argues the victim

---

7. The California court cited as illustrations *Delia S. v. Torres*, 134 Cal.App.3d 471, 184 Cal.Rptr. 787 (1982) (delay in reporting assault); *State v. Middleton*, 294 Or. 427, 657 P.2d 1215 (1983) (inconsistent post-incident statements by 14–year–old incest victim); and *Terrio v. McDonough*, 16 Mass.App. 163, 450 N.E.2d 190 (1983) (complainant returned briefly to scene of attack in order to retrieve belongings).

consented to sexual intercourse." 231 Kan. at 654, 647 P.2d at 1299. The court then held:

An examination of the literature clearly demonstrates that the so-called "rape trauma syndrome" is generally accepted to be a common reaction to sexual assault. See McCombie, The Rape Crisis Intervention Handbook, pp. 124–26 (1980); Comprehensive Textbook of Psychiatry §§ 21.1d, 24.15, pp. 1519, 1804–05 (Kaplan, Freedman and Sadock 3rd ed. 1980); Warner, Rape & Sexual Assault, pp. 145–49 (1980); Burgess & Holmstrom, Rape: Crisis & Recovery, pp. 35–47 (1979); Katz & Mazur, Understanding the Rape Victim, pp. 215–31 (1979); E. Hilberman, The Rape Victim, p. 36 (1976); Burgess & Holmstrom, Rape: Victims of Crisis, pp. 37–51 (1974). As such, qualified expert psychiatric testimony regarding the existence of rape trauma syndrome is relevant and admissible in a case such as this where the defense is consent. [*Id.*[8]]

The Supreme Court of Montana has agreed with the Kansas court and allows RTS testimony as an aid to the jury. *State v. Liddell,* 685 P.2d 918 (Mont.1984). Even though rape "is only one such severe trauma which can cause the symptoms," the court believed "that skilled direct and cross-examination of an expert in this area can assist the jury in determining whether, in fact, the victim consent-

---

**8.** A bibliography furnished by Dr. Spodak to the circuit court as a partial listing of authoritative works on the psychological reactions to the trauma of rape includes the following references:

Atkeson, Calhoun, Resick & Ellis, *Victims of Rape: Repeated Assessment of Depressive Symptoms,* 50 J. Consulting and Clinical Psychology, 96–102 (1982);

Burgess & Holmstrom, *Adaptive Strategies and Recovery from Rape,* 136 Am.J.Psychiatry, 1278–82 (1979);

Martin, Warfield & Braen, *Physician's Management of the Psychological Aspects of Rape,* 249 J.A.M.A., 501–03 (1983);

Norris & Feldman-Summers, *Factors Related to the Psychological Impacts of Rape on the Victim,* 90 J. Abnormal Psychology, 562–67 (1981); and

Schuker, *Psychodynamics and Treatment of Sexual Assault Victims,* 7 J.Am.Acad.Psychoanalysis, 553–73 (1979).

ed to the act." *Id.* at 923. Because of its relevance, the court rejected a contention that such evidence would potentially confuse and mislead the jury.

After the California, Minnesota, and Missouri cases had been decided, the Kansas court in *State v. McQuillen*, 236 Kan. 161, 689 P.2d 822 (1984) again considered the subject. That court saw as the common thread, in the cases where courts have ruled RTS evidence to be inadmissible, testimony from the expert as to "whether or not he believed the victim was telling the truth in stating she was raped by the defendant, thus creating the presumption that she was raped." *Id.* at 169–70, 689 P.2d at 828. The Kansas court reaffirmed the position it had taken in *Marks, supra.*

The Supreme Court of Arizona has recently held that RTS testimony is admissible where the question is one of consent. *See State v. Huey*, 145 Ariz. 59, 699 P.2d 1290 (1985). The testimony of the expert in that case "centered more on general observations of stress than on a description of a unique psychological response...." *Id.* at 63, 699 P.2d at 1294. The witness never used the term "rape trauma syndrome," nor did he describe the two phases of RTS outlined by Burgess and Holmstrom in 131 Am. J. Psychiatry, *supra.* As an alternative holding the court said that even if the witness had described RTS, the evidence would have been admissible on the rationale of the Kansas and Montana cases.

The salient factors considered in both lines of cases reviewed above lead us to conclude that the trial judge did not abuse his discretion under the circumstances of the instant case. Dr. Spodak never used the term "rape trauma syndrome," and avoiding that terminology is more than cosmetic. The concern with unfair prejudice is largely reduced when the terminology does not equate the syndrome exclusively with rape. In both his terminology and in his explanation, Dr. Spodak was careful to point out that severe traumas, other than rape, can produce the disorder which warrants the diagnosis of PTSD. Nor did Dr. Spodak

attempt to express a personal opinion on Mrs. Lemon's credibility. It was in response to a defense question emphasizing that the validity of the opinion depended on the truth of the history that Dr. Spodak referred, without a motion to strike, to the compatibility of Mrs. Lemon's description with the textbook symptoms as evidence of what he called getting "the straight scoop." In addition, Dr. Spodak testified in the State's rebuttal case after Allewalt had acknowledged having had intercourse with Mrs. Lemon and after he swore it was consensual. Just as a jury can understand that evidence of the complainant's hysteria shortly following an alleged sexual assault tends to negate consent, so a jury, with the assistance of a competent expert, can understand that a diagnosis of PTSD tends to negate consent where the history, as reviewed by the expert, reflects no other trauma which in the expert's opinion could produce that medically recognized disorder. By requiring a full explanation on direct, by allowing liberal cross-examination, and by proper jury instructions, all of which occurred in this case, the trial court can prevent any impression that the psychiatric opinion is like a chemical reaction.

We hold only that in this case the trial court did not abuse its discretion in admitting the testimony of Dr. Spodak. We emphasize that admissibility is a matter of trial court discretion based on the facts. When a trial judge admits PTSD evidence because he believes that the existence of the disorder coupled with the absence of any triggering trauma, other than the evidence of rape, will aid the jury the ruling necessarily carries certain baggage with it. Cross-examination can include not only cross-examining the expert about PTSD in general, but also cross-examining the expert and the prosecutrix about possible causes of the disorder other than the assault charged in the criminal case. In addition, we can foresee cases where the defendant will seek to counter the State's PTSD evidence with his own expert testimony. That can, in turn, lead to issues concerning compulsory psychiatric examination of the complainant by an expert for the defense. Lurking in the background is

the nice question of whether the absence of PTSD is provable by the accused in defense of a rape charge, as tending to prove that there was consent. See, as to RTS generally, Massaro, *Experts, Psychology, Credibility, and Rape: The Rape Trauma Syndrome Issue and its Implications for Expert Psychological Testimony,* 69 Minn.L.Rev. 395 (1985); Comment, *Expert Testimony on Rape Trauma Syndrome: Admissibility and Effective Use in Criminal Rape Prosecution,* 33 Am.U.L.Rev. 417 (1984); Note, *Checking the Allure of Increased Conviction Rates: The Admissibility of Expert Testimony on Rape Trauma Syndrome in Criminal Proceedings,* 70 Va.L.Rev. 1657 (1984). When ruling on whether to receive State proferred evidence of PTSD a trial judge will have to weigh the benefit of the evidence not only against potential unfair prejudice, but also against the complexity of possibly accompanying issues and against the time required properly to try the expanded case.

## II & III

Allewalt presents two additional issues involving sentences which are not permitted by law. On the conviction for fourth-degree sexual offense the court sentenced Allewalt to eighteen months imprisonment, but the maximum imprisonment permitted is one year. *See* Md.Code (1957, 1982 Repl. Vol.), Art. 27, § 464C(b). On his conviction for common law assault an additional, concurrent sentence of eighteen months was imposed. Allewalt correctly argues that, under the facts of this case, the assault merges into the second-degree rape conviction. *See Green v. State,* 243 Md. 75, 220 A.2d 131 (1966). Although these issues were not raised in the trial court, they may be considered on appeal. *Walczak v. State,* 302 Md. 422, 488 A.2d 949 (1985). The State does not contest that these points are substantively meritorious.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT

OF CONVICTION OF THE CIRCUIT COURT FOR BALTI-
MORE COUNTY ON THE CHARGE OF RAPE IN THE
SECOND DEGREE; TO VACATE THE SENTENCE ON
THE CHARGE OF ASSAULT; AND TO REMAND TO
THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR
RESENTENCING ON THE CHARGE OF FOURTH-DE-
GREE SEXUAL OFFENSE. COSTS TO BE PAID BY
WILLIAM ALFRED ALLEWALT.

ELDRIDGE, Judge, dissenting:

The majority today holds that the trial court did not err
by admitting testimony relating to post-traumatic stress
disorder (PTSD) in a rape case to prove lack of consent. I
disagree.

I believe that the *Frye* test,[1] which this Court adopted in
*Reed v. State*, 283 Md. 374, 389, 391 A.2d 364 (1978), as the
standard for evaluating the admissibility of the results of a
scientific process or technique, is applicable in the present
case. Moreover, the testimony at issue does not meet that
test for admissibility because the presence or absence of
post-traumatic stress disorder is not "generally accepted" in
the relevant scientific community as reliable evidence as to
whether a rape in the legal sense occurred or whether a
woman consented to a particular act of sexual intercourse.
Testimony about PTSD is therefore inadmissible, under the
*Frye* test, for that purpose.

Even if the *Frye* test were inapplicable, I would decide,
nonetheless, that the trial court abused its discretion in the
present case by admitting Dr. Spodak's testimony. The
dangers of unfair prejudice and confusion of the issues
arising from his testimony drastically outweighed whatever
minimal probative value it may have had. In addition, Dr.
Spodak impermissibly invaded the province of the jury by
expressing an opinion about the credibility of the complain-
ing witness's testimony.

---

1. *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923).

## I.

### A.

Courts which have addressed the admissibility of expert opinion testimony about rape trauma syndrome or post-traumatic stress disorder in a rape prosecution to show lack of consent have generally considered, as a threshold question, whether the basis of the opinion is accepted as accurate and reliable in the scientific community. Most have applied the standard set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), and adopted by this Court in *Reed v. State, supra,* 283 Md. at 389, 391 A.2d 364. This standard requires, where an expert opinion is based upon a new scientific process or method, that the scientific process be shown to be "generally accepted as reliable within the expert's particular scientific field" before his opinion may be received in evidence at trial. *People v. Bledsoe,* 36 Cal.3d 236, 203 Cal.Rptr. 450, 457 n. 7, 681 P.2d 291, 298 n. 7 (1984); *State v. Marks,* 231 Kan. 645, 647 P.2d 1292, 1299 (1982); *State v. Taylor,* 663 S.W.2d 235, 239–240 (Mo.1984). *See State v. Huey,* 145 Ariz. 59, 699 P.2d 1290, 1294 (1985) (quoting *State v. Marks, supra* ); *State v. Saldana,* 324 N.W.2d 227, 229–230 (Minn.1982) (evidence of rape trauma syndrome "may not be introduced 'until further evidence of the scientific accuracy and reliability of syndrome or profile diagnoses can be established.' ") *But see State v. Liddell,* 685 P.2d 918, 923 (Mont.1984).

The State contends that the *Frye* test does not apply because post-traumatic stress disorder is a "mental disorder ... not a scientific test, technique or process" and that *Frye* "applies to tests or techniques used primarily to measure or identify something." (State's Reply Brief, p. 3). I do not agree.

In *State v. Collins,* 296 Md. 670, 679–681, 464 A.2d 1028 (1983), we applied the *Frye* test to expert testimony based on a witness having been hypnotized. This Court agreed with the reasoning of the Supreme Court of Minnesota in

*State v. Mack,* 292 N.W.2d 764, 768 (Minn.1980), where it was said:

"Under the *Frye* rule, the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view that the results are scientifically reliable as accurate. Although hypnotically-adduced 'memory' is not strictly analogous to the results of mechanical testing, we are persuaded that the *Frye* rule is equally applicable in this context, where the best expert testimony indicates that no expert can determine whether memory retrieved by hypnosis, or any part of that memory, is truth, falsehood, or confabulation—a filling of gaps with fantasy. Such results are not scientifically reliable as accurate."

In the instant case, expert testimony that the complainant Mrs. Lemon suffered from post-traumatic stress disorder (PTSD) and that, in the expert's opinion, the rape described by Mrs. Lemon caused the trauma, was offered to show that she did not consent to intercourse and that a rape, in the legal sense, occurred.

Although, like the testimony at issue in *Collins,* this testimony "is not strictly analogous to the results of mechanical testing," the policy reasons behind the *Frye* rule are equally applicable in this context. In *Reed v. State, supra,* the Court set forth the policies underlying the *Frye* test. We said that "[f]airness to a litigant would seem to require that before the results of a *scientific* process can be used against him, he is entitled to a *scientific* judgment on the reliability of that process." 283 Md. at 385, 391 A.2d 364. Accordingly, "laymen should not on a case by case basis resolve a dispute in the scientific community concerning the validity of a new scientific technique." *Id.* at 387, 391 A.2d 364. This would lead to inconsistent decisions in different cases. The *Frye* standard avoids this problem.

In addition, by not admitting evidence of a particular process or technique until it is generally accepted in the

scientific community, courts avoid distracting the trier of facts from the merits of the case with a protracted battle of experts over the reliability of a particular process or technique which "may well degenerate into trials of the technique itself." *Reed v. State, supra,* 283 Md. at 388, 391 A.2d 364. Because these policy considerations apply equally to expert testimony concerning post-traumatic stress disorder introduced to prove lack of consent in a rape case, I would hold that before a trial court may receive such evidence it must be shown that evidence of post-traumatic stress disorder is generally accepted by psychiatrists and psychologists for this purpose.

### B.

The majority correctly indicates that "[t]here is no issue in this case over the fact that psychiatrists and psychologists recognize PTSD as an anxiety disorder." The recent psychiatric manual, American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 236–238 (3d ed. 1980), lists four diagnostic criteria for the disorder: 1) the existence of a recognizable stressor that would evoke significant symptoms of distress in almost everyone, 2) reexperiencing of the trauma, as in dreams and intrusive recollections, 3) numbing of responsiveness to or reduced involvement with the external world, and 4) at least two of the following symptoms that were not present before the trauma: exaggerated startle response, sleep disturbance, guilt about surviving when others have not, memory impairment or trouble concentrating, avoidance of activities that arouse recollection of the traumatic event, and intensification of symptoms by exposure to events that resemble the traumatic event.

In 1974, Ann Burgess and Lynda Holmstrom coined the term "rape trauma syndrome" to describe the psychological symptoms of victims of sexual assault. Burgess & Holmstrom, *Rape Trauma Syndrome,* 131 Am.J.Psychiatry 981 (1974). Rape trauma syndrome is recognized as a sub-category of post-traumatic stress disorder in which the trigger-

ing trauma is rape. Rape and Sexual Assault: A Research Handbook 46–50 (A. Burgess ed. 1985); Martin, Warfield & Braen, *Physician's Management of the Psychological Aspects of Rape*, 249 J. A.M.A. 501 (1983).

Courts discussing the admissibility of testimony about rape trauma syndrome to show lack of consent in a rape prosecution have generally recognized that "[a]n examination of the literature clearly demonstrates that the so-called 'rape trauma syndrome' is generally accepted to be a common reaction to sexual assault." *State v. Marks, supra,* 647 P.2d at 1299. *Accord, State v. Huey, supra,* 699 P.2d at 1294; *People v. Bledsoe, supra,* 203 Cal.Rptr. at 458, 681 P.2d at 299; *State v. Taylor, supra,* 663 S.W.2d at 237. *See* A. Burgess & L. Holstrom, Rape: Crisis and Recovery 35–47 (1979); E. Hilberman, The Rape Victim 33–40 (1976); S. Katz & M. Mazur, Understanding the Rape Victim: A Synthesis of Research Findings 215–231 (1979); Martin, Warfield & Braen, *supra,* at 501; T. McCahill, L. Meyer & A. Fischman, The Aftermath of Rape 73–77 (1979); S. McCombie, The Rape Crisis Intervention Handbook 124–126 (1980); Rape and Sexual Assault, *supra* at 46–50.

The Supreme Court of Kansas held that rape trauma syndrome satisfied the *Frye* test because it "is generally accepted to be" a common reaction to sexual assault. *State v. Marks, supra,* 647 P.2d at 1299. Other courts, however, have recognized that the relevant question is whether the presence of rape trauma syndrome in the alleged victim is generally accepted by psychiatrists and psychologists as accurately and reliably showing that a rape in the legal sense occurred. *People v. Bledsoe, supra,* 681 P.2d at 299–301; *State v. Saldana, supra,* 324 N.W.2d at 229. *See State v. Taylor, supra,* 663 S.W.2d at 238. Nothing in the literature suggests that evidence of post-traumatic stress disorder or rape trauma syndrome reliably indicates that a rape has occurred. In *People v. Bledsoe, supra,* 203 Cal. Rptr. at 459, 681 P.2d at 300, the Supreme Court of California explained:

"[R]ape trauma syndrome was not devised to determine the 'truth' or 'accuracy' of a particular past event—i.e., whether, in fact, a rape in the legal sense occurred—but rather was developed by professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors' clients or patients. As the professional literature makes clear—and as the expert testimony in this case also reveals—because in the past women who have brought charges of rape have traditionally had their credibility or motives questioned by the police and others, rape counselors are taught to make a conscious effort to avoid judging the credibility of their clients. As one expert in the field recently wrote: 'When a woman seeks services from a psychologist, she wants and deserves help for her problems, not judgment. *Judgment is appropriate for courtrooms, not for psychologists' offices....* [¶] When a psychologist becomes judgmental, he/she has become entrapped in a major pitfall. The victim is likely to view her disclosure behavior as having been punished, to discontinue treatment and to become reluctant to seek services in the future. The obvious way to avoid this pitfall is to remember that your role is to provide services to your client, not to make a judgment about whether a "real" rape occurred or about the victim's culpability.' (Italics added.) (Kilpatrick, *Rape Victims: Detection, Assessment and Treatment* (Summer 1983) Clinical Psychologist 92, 94.)"

Because post-traumatic stress disorder "is not a fact-finding tool, but a therapeutic tool useful in counseling," *State v. Saldana, supra,* 324 N.W.2d at 230, and the relevant scientific "literature does not even purport to claim" that the disorder is "a scientifically reliable means of providing that a rape occurred," *People v. Bledsoe, supra,* 203 Cal.Rptr. at

460, 681 P.2d at 301, I would hold that it is not admissible for that purpose in a criminal trial.[2]

## II.

Assuming arguendo that the *Frye* test should not be applied here, the trial court nevertheless abused its discretion by admitting the testimony of Dr. Spodak. The danger of prejudice and confusion of the issues which arose from the admission of this evidence far outweighed its minimal probative value. *See State v. Werner,* 302 Md. 550, 556, 489 A.2d 1119 (1985); *Vitek v. State,* 295 Md. 35, 39–40, 46, 453 A.2d 514 (1982); McCormick on Evidence § 185 (3d ed. 1984).

Dr. Spodak's testimony began with a lengthy explanation of the nature of post-traumatic stress disorder. He then testified that, in his opinion, Mrs. Lemon was suffering from the disorder. He stated that his diagnosis was based "for the most part" on Mrs. Lemon's own statements about her symptoms, and he related the symptoms which she had reported. The prosecutor asked: "What would be the trauma that forms the basis of your opinion?" Spodak responded as follows:

"A The only trauma that she claims that she went through at that time was being raped. She related no other—she did say that she separated from her husband in March of 1983 and subsequent to that separation went through some depression and became sedentary and lost some weight and so on. In fact, some of that started even before the separation and she sought treatment for that and she was going along—I wouldn't say she was recovering, but she way, you know, in treatment, and she was sort of adjusting to that whole experience when the second trauma occurred in June. After that, she definite-

---

**2.** Such evidence may, however, be admissible on the issue of damages in a civil suit or to rebut allegations by the defendant in a rape prosecution that the behavior of the victim after the incident is inconsistent with her claim of having been raped. *See People v. Bledsoe, supra,* 203 Cal.Rptr. at 457, 681 P.2d at 298, and cases cited therein.

ly took an emotional nosedive, if you will, and that was the only, the only trauma that she described occurring around that time.

"Q Doctor, since you in fact were aware of marital problems that she was experiencing and the fact that she was going through some sort of treatment or counseling for that, in your opinion would the breakup of the marriage of 16 years be considered a traumatic event such that it would give rise to this kind of diagnosis?

"A No. First of all, it is not the type of trauma that gives rise to this diagnosis at all. It is more of a stressful situation that can cause a stress reaction with depression and anxiety and so on, but it doesn't cause nightmares and flashbacks and avoidant behavior and being uncomfortable around young males and so on. So, for starters, it just doesn't account for this kind of reaction, and it certainly would be most unusual, if it were to occur at all, to occur three months down the road. If it was going to occur, you would expect it right after the incident. But, as I say, it doesn't cause this kind of reaction at all."

On cross-examination, Dr. Spodak reiterated his opinion that no event in Mrs. Lemon's history other than the alleged rape could have caused Mrs. Lemon's symptoms. The defense attorney asked if Spodak would have to believe that the trauma reported by the patient actually took place in order for a diagnosis of post-traumatic stress disorder to be valid. He replied:

"A I think it is more important that the individual reporting, that is the patient or person you are evaluating, believes that it took place. But, yes, I think, the whole diagnosis is predicated on the assumption that some traumatic incident occurred, sure.

"Q So the diagnosis essentially is predicated on a belief in what the patient indicates to you took place?

"A Well, it is that coupled with, because we are constantly called upon to answer the question of whether, especially in work related incidents of trauma, are people

malingering or not. If they describe the things that are well recognized in the textbooks as going with the condition and describe the time sequence which matches what is known about the condition, and in this case it is pretty solid evidence that they are giving you the straight scoop, if you will. So, yes, it is true that one has to presume that the trauma actually occurred. But there are a lot of other ways of in a sense checking out a story that has to do with what is known about the condition."

In essence, Dr. Spodak testified that in his opinion Mrs. Lemon was suffering from post-traumatic stress disorder, that the rape she described caused the disorder, and that she was telling the truth.

As explained in Part I above, nothing in the relevant scientific literature indicates that the type of post-traumatic stress disorder symptoms known as rape trauma syndrome reliably proves that a rape actually occurred.[3] The Court of Special Appeals correctly pointed out that, "[w]hile evidence of PTSD may be relevant to prove the victim's resulting injury, it does not establish that rape was the trauma causing it." *Allewalt v. State*, 61 Md.App. 503, 515, 487 A.2d 664 (1985). Whatever minimal probative value the evidence may have in this context is outweighed by the dangers it presents. Thus, the Supreme Court of Minnesota observed in *State v. Saldana, supra,* 324 N.W.2d at 230:

"Permitting a person in the role of an expert to suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the complainant was therefore raped, unfairly prejudices the appellant by creating an aura of special reliability and trustworthiness. Since jurors of ordinary abilities are competent to consider the evidence and determine whether the alleged crime

---

**3.** In *State v. Saldana, supra,* the Supreme Court of Minnesota said that "[t]he scientific evaluation of rape trauma syndrome has not reached a level of reliability that surpasses the quality of common sense evaluation present in jury deliberations." 324 N.W.2d at 230.

occurred, the danger of unfair prejudice outweighs any probative value. To allow such testimony would inevitably lead to a battle of experts that would invade the jury's province of fact-finding and add confusion rather than clarity."

See People v. Bledsoe, supra, 203 Cal.Rptr. at 460, 681 P.2d at 301 (quoting Saldana); State v. McQuillen, 236 Kan. 161, 689 P.2d 822, 832–834 (1984) (Schroeder, C.J., dissenting);[4] State v. Taylor, supra, 663 S.W.2d at 241–242.

Moreover, Dr. Spodak's testimony invaded the province of the jury because he implicitly expressed an opinion about the credibility of the witness's testimony. The majority contends that Dr. Spodak did not "attempt to express a personal opinion on Mrs. Lemon's credibility." I disagree. State v. Taylor, supra, involved testimony very similar to Spodak's testimony here. Dr. Amanat, the expert witness in Taylor, testified that "he approached the victim's disorder as rape trauma syndrome because she had been raped and because her nonverbal responses during the examination verified this information" and that "to the best of his knowledge there was nothing in the victim's history outside the alleged rape that would have caused the intensity of her response." 663 S.W.2d at 237. The court said that Dr. Amanat's "entire testimony that the victim suffered from rape trauma syndrome carried with it an implied opinion that the victim had told the truth in describing the rape" and that his testimony that "he was specifically trained to evaluate verbal and nonverbal responses lends a special reliability to his opinion of the victim's credibility." Id. at 241. The court stated that "[t]here is a risk that the jury will regard the expert's opinion that a victim suffers from rape trauma syndrome resulting from a forcible assault as dispositive on the issue of consent." Ibid.

---

4. In State v. McQuillen, supra, three judges dissented on grounds that evidence of rape trauma syndrome should not be admitted in a rape prosecution where consent is the defense and that State v. Marks should be overruled on this point.

Similarly, Dr. Spodak's testimony that Mrs. Lemon suffered from post-traumatic stress disorder caused by the rape she described amounts to expressing an opinion that she told the truth in describing the rape. This Court has held that "[a] witness cannot be asked to characterize the testimony of another [witness] since that is exclusively the function of the jury." *American Stores v. Herman,* 166 Md. 312, 314–315, 171 A. 54 (1934). *See Thompson v. Phosphate Works,* 178 Md. 305, 13 A.2d 328 (1940).[5] In addition, Dr. Spodak testified that his belief of Mrs. Lemon's testimony that she was raped was based on "pretty solid evidence" and that she was giving him "the straight scoop." This testimony, coupled with Spodak's status as an expert, could easily have caused the jury to give Spodak's opinion that Mrs. Lemon was telling the truth undue weight. The jury may well have considered Spodak's opinion dispositive on the issue of consent.[6]

In holding that the trial court in this case did not abuse its discretion in admitting the testimony, the majority emphasizes that Dr. Spodak used only the term "post-traumatic stress disorder" and never described Mrs. Lemon's symptoms as "rape trauma syndrome." The majority says:

---

**5.** In *Reed v. State, supra,* 283 Md. at 400, 391 A.2d 364, Judge Smith in dissent, taking the position that the *Frye* test should not be adopted by the court as the basis for evaluating testimony regarding voiceprints, distinguished *Frye* from *Reed.* He stated that "[t]he evidence proposed in *Frye* was an obvious invasion of the province of the jury since the trier of fact is vested with the responsibility of determining the credibility of witnesses." *Id.* at 402–403, 391 A.2d 364.

**6.** Some jurisdictions allow expert testimony concerning the credibility of a witness in "unusual cases," *State v. Saldana, supra,* 324 N.W.2d at 231, *citing United States v. Barnard,* 490 F.2d 907, 913 (9th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974), such as where the witness is a child or mentally retarded, *see Commonwealth v. Carter,* 9 Mass.App. 680, 403 N.E.2d 1191 (1980), *aff'd,* 383 Mass. 873, 417 N.E.2d 438 (1981) (whether child could distinguish reality from fantasy), or where there is evidence that the witness is insane. *See generally* Conrad, *Psychiatric Lie Detection: The Federal Court's Break with Tradition,* 21 F.R.D. 199 (1958); Juviler, *Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach,* 48 Cal.L. Rev. 648 (1960).

"[A]voiding that terminology is more than cosmetic. The concern with unfair prejudice is largely reduced when the terminology does not equate the syndrome exclusively with rape. In both his terminology and in his explanation, Dr. Spodak was careful to point out that severe traumas, other than rape, can produce the disorder which warrants the diagnosis of PTSD."

The majority also contends that Dr. Spodak "did not purport to have invented a scientific test for determining consent to sexual intercourse had months earlier." I disagree with the majority's characterization of Dr. Spodak's testimony. Allowing Dr. Spodak to testify that, in his opinion, the alleged victim's symptoms were caused by the rape she described, and to testify that his opinion is based on "pretty solid evidence" that she was giving him "the straight scoop," is extremely likely to give the jury the impression that he had a scientific method or test for determining whether the rape occurred and whether his patient was telling him the truth.

Moreover, using the term "post-traumatic stress disorder," instead of the term "rape trauma syndrome," does not significantly reduce the danger of unfair prejudice to the defendant. The prejudice arises primarily from allowing an expert to suggest that, because the alleged victim subjectively reports certain symptoms, she was in fact raped. Such testimony gives "a stamp of scientific legitimacy to the truth of the complaining witness's factual testimony." *State v. Saldana, supra,* 324 N.W.2d at 231 (*quoting People v. Izzo,* 90 Mich.App. 727, 730, 282 N.W.2d 10, 11 (1979)).

Inevitably, defendants in rape prosecutions will seek to counter the state's PTSD evidence with testimony that the complaining witness is not suffering from PTSD or that a trauma other than rape has caused her symptoms. As the majority notes, this will "lead to issues concerning compulsory psychiatric examination of the complainant by an expert for the defense." The majority implies that its holding that testimony as to the presence of PTSD is admissible to

show lack of consent does not necessarily mean that testimony as to its absence will be admissible to show consent. Nonetheless, allowing the benefit of such evidence to the prosecution but not to the defense would be "fundamentally unfair and unduly prejudicial to the defendant in a rape prosecution." *State v. McQuillen, supra,* 689 P.2d at 836 (Schroeder, C.J., dissenting).

On the other hand, if both the prosecution and defense are allowed to introduce PTSD evidence on the issue of consent, there is a significant danger that rape trials will degenerate into a battle of experts about the validity of PTSD evidence to show nonconsent and the presence or absence of this disorder in the complaining witness.

Because the danger of unfair prejudice and confusion of the issues from Dr. Spodak's testimony far outweighed whatever limited probative value it may have had, and because his testimony invaded the province of the jury, I would hold that the trial court erred in admitting it.

### III.

Turning to Judge McAuliffe's concurring opinion, the distinction which he makes between admissible preliminary questions and inadmissible ultimate questions has not been reflected in the holdings of the cases admitting or excluding expert testimony on PTSD. This distinction has, however, been recognized in dicta, *State v. McQuillen, supra,* 689 P.2d at 829 (expert may testify as to existence of PTSD in victim, but may not state that rape caused victim's disorder), and in a dissenting opinion, *State v. McGee,* 324 N.W.2d 232, 234 (Minn.1982) (because expert did not testify as to whether in his opinion rape actually occurred, his testimony should be admissible).[7] Nevertheless, neither

7. The distinction has also been discussed in other contexts: *State v. Middleton,* 294 Or. 427, 657 P.2d 1215 (1983) (expert testimony on sexually abused children); *Buhrle v. State,* 627 P.2d 1374 (Wyo.1981) (expert testimony on battered wife syndrome); *Hampton v. State,* 92

these opinions nor any other authority of which I am aware require counsel, opposed to an entire line of testimony, to object only to the ultimate question. The defendant should not be penalized for his counsel's failure to foresee the position adopted by Judge McAuliffe and failure to frame the objection precisely in accordance with Judge McAuliffe's position.

Moreover, the record in this case clearly indicates that the prosecution desired the admission of the entire line of testimony concerning PTSD, leading to answers to the ultimate questions of whether Mrs. Lemon suffered from PTSD and whether the asserted rape caused the condition. The defendant's objection was to the entire line of testimony. The admissibility of the whole body of testimony concerning PTSD has consistently been the principal disputed issue in this case, and it was properly preserved for appellate review.

Finally, no issue regarding the adequacy of the defendant's objection is properly before this Court. Even if the defendant's objection were insufficient, the Court of Special Appeals decided the question concerning the admissibility of the PTSD testimony. The Court of Special Appeals has discretion to decide the merits of an issue despite the failure of a party to raise the issue at trial or to object at trial. *See, e.g., Squire v. State,* 280 Md. 132, 135, 368 A.2d 1019 (1977); *Dempsey v. State,* 277 Md. 134, 141–142, 355 A.2d 455 (1976). *See also State v. Hutchinson,* 287 Md. 198, 411 A.2d 1035 (1980). In such situation, this Court has consistently viewed any question concerning the adequacy of an objection at trial or preservation at trial as a separate issue under Maryland Rule 813. If it is not raised in a petition or cross petition for a writ of certiorari, and encompassed in our grant of certiorari, the matter is not before us, and we decide the case based upon our resolution of merits of the questions presented. *Dean v. State,* 291 Md. 198, 202, 434

Wis.2d 450, 285 N.W.2d 868 (1979) (expert testimony on the reliability of eyewitness identifications).

A.2d 552 (1981); *Dempsey v. State, supra,* 277 Md. at 142–143, 355 A.2d 455.

Judge COLE has authorized me to state that he concurs with the views expressed herein.

McAULIFFE, Judge, concurring.

I agree that testimony explaining post-traumatic stress disorder (PTSD) is admissible in rape prosecutions. I do not agree that opinion testimony should be received on the question of whether the complainant actually suffered PTSD.

The relevant scientific community has long accepted the proposition that certain physical and emotional traumas may cause a person to suffer physical and emotional responses. Certain of these responses are so commonly known and understood that expert testimony is unnecessary to establish a causal relationship between the trauma and the response. For example, testimony that a complainant was crying and upset when she reported a rape is accepted, usually without question. The evidence is circumstantial, corroborative and relevant. It does not prove that a rape occurred. It does prove that something probably occurred in the life of the complainant sufficient to provoke the reaction. Furthermore, it is within the common knowledge and understanding of laypersons that a rape may well produce such a response. To borrow the language of the psychiatrist, the act of rape is a "recognizable stressor." It is also common knowledge that many other stressors, physical and emotional, are capable of producing the same symptoms. Thus, we do not indulge the hypothesis that because a complainant is upset and crying she was therefore raped. Rather, we accept the evidence for its proper circumstantial value.

Evidence of PTSD is offered for the same purpose, and similarly should be admissible if it is proven that the same kind of causal relationship exists between a stressor such as rape and an identifiable coalescence of certain symptoms.

That such a relationship does exist, and that both the recognizable stressors and the resulting symptoms have been identified, are beyond reasonable dispute. The relevant scientific community accepts this phenomenon as PTSD. The difference between the commonly accepted concept that a rape will often cause a victim to become upset and cry, and the medically accepted concept of PTSD, is not that one is valid and the other is not. They are both valid. The only difference is that PTSD is not within the common knowledge of laypersons. Thus, expert testimony is required to provide an understanding of PTSD.

The question therefore arises: What expert testimony is needed to allow the trier of fact to utilize evidence of PTSD in the same manner it customarily utilizes evidence of the more commonly known and immediate reactions to trauma? In answering this question, we must keep in sharp focus the legitimate purpose for which this type of evidence is offered.

The trier of facts needs to know only this: What is PTSD? What are the recognized stressors? What are the recognized symptoms? What, if any, are the temporal limitations on the cause-effect relationship? Armed with this information, the trier of fact will be in the same position as when such matters are within its common knowledge—it may accept or reject the permissible inference, and if accepted, afford the inference such weight as may be appropriate.

Allowing the expert to go beyond providing this information, and to opine that a particular complainant is suffering from PTSD, is error. As Doctor Spodak made clear, in order to make a *diagnosis* of PTSD, the physician must assume the existence of a recognizable stressor—in this case a rape. Injecting the issue of diagnosis is wholly unnecessary and gives rise to the very real possibility that a jury will conclude that the physician believes the complainant is telling the truth about the occurrence of a rape. Doctor Spodak was in no better position than the jurors to

assess the credibility of the complainant. The value of his testimony lay in furnishing the jurors information that would permit them to draw a rational inference corroborative of the complaint of rape, if they believed the complainant's testimony concerning her symptoms and concerning the absence of any other recognizable stressors in her life.

This is not a personal injury case where the trauma is usually conceded and expert testimony of a diagnosis is received to demonstrate the extent of damage. This is a case where the jury should determine whether certain symptoms exist, whether any recognized stressors other than the rape were present, and what, if any, inferences are to be drawn from those findings. The jury needs only the information to which we have earlier referred to make these determinations.

The physician may be asked hypothetical questions to elicit information that will aid the jury in its understanding of how the particular facts of the case square with the recognized concepts of PTSD. Assuming the existence of a sufficient foundation or proffer of facts, the State may ask a physician whether a certain set of symptoms are or are not consistent with the existence of PTSD. The State may ask whether a rape as described by the complainant would constitute a recognized stressor, and whether the temporal factors indicated by the testimony are consistent or inconsistent with the existence of PTSD. In each instance, the physician is asked to assume the truth of certain facts, and the expertise of the physician is used to inform the jury whether the facts fit the known mold of PTSD. The physician is not expressly or implicitly asked to assess the credibility of the complainant.

I concede that the line I draw is a fine one and that a skillful prosecutor might fashion a question which so clearly reveals the hypothetical nature of the included facts that it would be appropriate as a predicate for a hypothetical

diagnosis. But the danger that the jury may understand the answer to involve an assessment of credibility is too great, particularly where the necessity for a diagnosis does not exist. The better course is to prohibit the State from eliciting testimony concerning a diagnosis of PTSD.

In the case before us, the prosecutor skillfully developed the necessary and appropriate information during the initial portion of his direct examination of Doctor Spodak. He went astray, in my judgment, when he asked the doctor to express his opinion as to whether this complainant suffered PTSD after June 25, 1983, and to identify the particular trauma that precipitated her condition. Concededly the prosecutor wove into each question the request that Doctor Spodak assume the truth of certain facts, but for reasons previously stated I conclude the better course is to avoid such questions entirely.

The error, however, was not preserved for appellate review. Allewalt's objection was to the admissibility of *any* evidence relating to PTSD on the grounds that 1) such evidence could not furnish assistance to the jury, 2) the concept of PTSD had not received general acceptance within the relevant scientific community, and 3) allowing PTSD evidence would usurp the jury's function. His objection was made at the conclusion of the hearing conducted out of the presence of the jury and was properly overruled because expert testimony concerning PTSD was admissible. Thereafter, Allewalt interposed no objection as the evidence was presented to the jury, except to suggest that Doctor Spodak could not be an expert in the field of PTSD because no such specialty existed. Allewalt's approach, therefore, was all-or-nothing, and he may not now complain that specific questions were objectionable on other grounds.

As I am in agreement with Parts II and III of the majority opinion, and reach the same result as the majority in Part I, I concur in the result.